COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES EX REL. FANETTA
ARNOLD ET AL. *v.* JEAN M. FORVIL
ET AL.
(SC 18500)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and
Harper, Js.

Argued May 16—officially released August 30, 2011

*Edward F. Kunin,* for the appellants (defendants).

*Robin S. Kinstler Fox,* human rights attorney, for the appellee (plaintiff).

*Alan Rosner,* for the appellees (relators).

*Opinion*

HARPER, J. The defendants, Jean M. Forvil and Victoire Forvil, appeal from the judgment of the trial court, rendered after a trial to the court, in favor of the plaintiff, the commission on human rights and opportunities (commission), assessing a fine to be paid to the commis-

sion and awarding damages to Fanetta Arnold and her two minor children (relators)[1] for the defendants' refusal to rent housing to the relators on the basis of a "lawful source of income" in violation of General Statutes § 46a-64c (a).[2] The defendants raise numerous claims, challenging, inter alia, the trial court's jurisdiction on the basis of the timeliness of its rendition of the judgment and the propriety of its conclusion that a security deposit guarantee (guarantee) is a lawful source of income within the meaning of the housing discrimination statutes. See General Statutes § 46a-63 (3). We affirm the judgment of the trial court.

The trial court found the following facts, which are not challenged on appeal. In early 2006, Arnold met with the defendants to view an apartment for rent in a building owned by them. The defendants informed Arnold that she would need to provide a security deposit, which equaled twice the monthly rent of $800. Arnold replied that she would provide a guarantee[3] in lieu of cash to satisfy the security deposit, to which

---

[1] Arnold's children, Kendasia Fisher and Trinity Cox, are also relators in the present action.

[2] General Statutes § 46a-64c (a) provides in relevant part: "It shall be a discriminatory practice in violation of this section:

"(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status . . . ."

" 'Lawful source of income' " in turn is defined under General Statutes § 46a-63 (3) as "income derived from Social Security, supplemental security income, housing assistance, child support, alimony or public or state-administered general assistance."

[3] The commissioner of social services is authorized to provide such guarantees "for use by [qualified persons] in lieu of a security deposit on a rental dwelling unit." General Statutes § 17b-802 (a). The guarantee is "a written agreement to pay the landlord for any damages suffered by the landlord due to the tenant's failure to comply with such tenant's obligations . . . provided the amount of any such payment shall not exceed the amount of the requested security deposit." General Statutes § 17b-802 (b).

Jean Forvil agreed. Thereafter, Arnold provided the defendants with a copy of the guarantee, and a move in date was established. When the relators attempted to take possession of the apartment on that date, the defendants prevented them from entering the apartment because the security deposit had not been paid in cash.

The relators then filed a complaint with the commission. The commission in turn brought this action against the defendants on the relators' behalf, alleging a violation of § 46a-64c (a) (1), which prohibits discrimination against prospective tenants based on, inter alia, a "lawful source of income . . . ." In their answer, the defendants raised constitutional and statutory special defenses to the action.

The case was tried to the court beginning on December 17, 2008, and finishing on January 13, 2009. On May 21, 2009, after both parties had filed briefs regarding damages, the trial court scheduled a hearing on damages for June 4, 2009. Prior to that hearing on damages, the court issued a memorandum of decision, dated June 4, 2009, rejecting the defendants' special defenses and concluding "that the [commission has] proven by a fair preponderance of all the evidence in this case that the defendants violated § 46a-64c when, on May 1, 2006, they rejected to rent the subject premises to Arnold." Following the hearing on damages, the trial court rendered judgment in the amount of $57,688 against the defendants, comprised of: $30,000 in compensatory damages to Arnold, $7500 in compensatory damages to each of her children, $5000 in punitive damages,[4] a $1000

[4] The record does not reveal whether the commission or the relators received this punitive damages award, which the trial court assessed because of the defendants' "continual refusal [to rent to the relators] once being made aware of [their] error."

civil penalty to the commission, and $6688 in attorney's fees to the relators' attorney. This appeal followed.[5]

On appeal, the defendants contend that: (1) the trial court lacked jurisdiction to render the judgment because it was untimely rendered; (2) the trial court improperly considered a guarantee to be a lawful source of income within the meaning of the housing discrimination statutes; (3) the trial court improperly concluded that a guarantee's validity is irrelevant to a claim of discrimination under § 46a-64c; (4) the compensatory damages to the relators were excessive; (5) the trial court improperly denied the defendants' motion to compel the commission to produce certain documents; (6) § 46a-64c is unconstitutionally vague; and (7) requiring landlords to accept a guarantee in lieu of a cash security deposit denies equal protection of the law to some landlords.[6] We are not persuaded by the first four claims, and we decline to address the latter three, as the defendants have inadequately briefed them.

I

Before discussing the merits of the underlying judgment, we must first consider the defendants' claim that

[5] The defendants appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] Within these seven claims, the defendants also make various unrelated contentions. As we later explain in this opinion, in addition to the fact that several of these claims are inadequately briefed for appellate review; see parts IV, V and VI of this opinion; others are wholly without merit. Having parsed the defendants' brief to make this assessment, we cannot help but repeat an admonition that this court has issued previously: "All of [the claims] suffer from the difficulty that appellate pursuit of so large a number of issues forecloses the opportunity for [a] fully reasoned discussion of pivotal substantive concerns. A shotgun approach does a disservice both to this court and to the party on whose behalf it is presented." *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991). "The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue] . . . ." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 117 n.3, 622 A.2d 519 (1993).

the trial court lacked jurisdiction to render that judgment against them. See *Valley Cable Vision, Inc.* v. *Public Utilities Commission,* 175 Conn. 30, 32, 392 A.2d 485 (1978) ("Whenever a lack of jurisdiction appears on the record, the court must consider the question. . . . The court must address itself to that issue and fully resolve it before proceeding further with the case." [Citation omitted.]). The defendants claim that General Statutes § 51-183b[7] deprives a trial court of jurisdiction to render judgment in a civil case once 120 days have passed from the completion of the trial in the case and that, in the present case, the trial court's June 4, 2009 judgment was rendered after the passage of that period of time. Specifically, the defendants point to the January 29, 2009 filing of their posttrial brief on damages as the act completing the trial that commenced the 120 day period. In response, the commission claims that, because the trial court ordered additional proceedings within 120 days after the submission of posttrial briefs, the trial effectively was extended until the completion of those proceedings. We agree with the commission, and, accordingly, conclude that § 51-183b did not deprive the trial court of jurisdiction to render judgment in this case.

We begin with the applicable standard of review. The jurisdictional question concerns a claim of "failure to comply with the rule requiring a court to render a decision within 120 days as set forth in . . . § 51-183b, which has long been held to implicate personal, rather than subject matter jurisdiction." *Remax Right Choice* v. *Aryeh,* 100 Conn. App. 373, 378, 918 A.2d 976 (2007); see also *Frank* v. *Streeter,* 192 Conn. 601, 603, 472 A.2d

---

[7] General Statutes § 51-183b provides: "Any judge of the Superior Court and any judge trial referee who has the power to render judgment, who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. The parties may waive the provisions of this section."

1281 (1984) ("[a] delay in decision beyond that authorized by the statute makes the decision voidable and, absent waiver, requires a new trial"). A challenge to the court's personal jurisdiction that presents a question of law applied to undisputed facts is an issue over which our review is plenary. See *Maltas* v. *Maltas*, 298 Conn. 354, 360, 2 A.3d 902 (2010); *Ryan* v. *Cerullo*, 282 Conn. 109, 118, 918 A.2d 867 (2007).

Our consideration of this question is guided by *Statewide Grievance Committee* v. *Ankerman*, 74 Conn. App. 464, 470, 812 A.2d 169, cert. denied, 263 Conn. 911, 821 A.2d 767 (2003). The facts of *Ankerman* are, for the purpose of this question, nearly identical to those of the present case. In *Ankerman*, following a trial and the submission of posttrial briefs, the parties attended a hearing on February 5, 2001. Id., 467. On June 5, 2001, less than 120 days after that February 5 hearing, the court issued a memorandum of decision finding that the defendant had violated the Rules of Professional Conduct, but ordered the parties to appear at a hearing to address the appropriate disposition on July 24, 2001, more than 120 days after the February 5 hearing. Id. On August 22, 2001, within 120 days of the July 24 hearing, the court rendered its judgment. Id., 468. The defendant appealed, claiming that the trial court had rendered judgment outside the period prescribed by § 51-183b because it was rendered more than 120 days after the February 5 hearing. Id., 465. The Appellate Court affirmed the judgment, reasoning that, "when the court ordered the parties to appear at a subsequent hearing . . . it opened the case." Id., 470. The Appellate Court went on to conclude that "the court opened the case . . . within 120 days from the . . . completion date of the trial. After the court conducted the additional hearing . . . the new completion date of the trial was [the date of that hearing]." Id., 473.

Although *Ankerman* is nearly identical to the present appeal in all ways relevant to this question, "we are not bound by a decision of the Appellate Court." *State* v. *Samuels*, 273 Conn. 541, 553 n.8, 871 A.2d 1005 (2005). Nevertheless, we are persuaded by the Appellate Court's position in *Ankerman* that, when a trial court properly reopens a case during the pendency of the 120 day statutory time period, the completion of proceedings scheduled on the date the proceedings were reopened constitutes the relevant completion date for purposes of commencing the 120 day limitation period for rendering judgment.[8]

In the present case, following the trial, the parties filed briefs regarding damages. The defendants filed their brief on January 29, 2009. Accordingly, January 29, 2009, was, undisputedly, the earliest date that could conceivably be designated as the trial's "completion date." *Frank* v. *Streeter*, supra, 192 Conn. 604 (" 'the completion date' includes the filing of briefs [because] the briefing of legal issues [is] a component of the judicial gathering of the materials necessary to a well-reasoned decision"). Following the filing of the defendants' brief on damages, the next activity in this case reflected by the record was the trial court's May 21, 2009 order scheduling a hearing for June 4, to address the subject of attorney's fees. The 120 day statutory period, counted from January 29, would not have expired prior to the May 21 order, but would have

---

[8] The defendants appear to suggest that *Ankerman* is distinguishable because the additional proceeding ordered in that case was ordered for the benefit of the defendant. While this seems to be factually accurate, we can conceive of no reason that this distinction bears on whether the reopening of the case creates a new completion date. Beyond this observation, the defendants do not articulate any reason that this court should not adopt the *Ankerman* position.

expired prior to the June 4 hearing. By properly[9] ordering an additional proceeding on May 21, within the 120 day period, the trial court clearly indicated that unresolved issues remained and reopened the case; the resolution of the hearing ordered on May 21, 2009, thus became the new completion date of the trial. The June 4, 2009 judgment was rendered following the hearing held on that date. Accordingly, because the judgment was rendered in a timely manner, the trial court properly exercised personal jurisdiction over the defendants.

## II

Having resolved the jurisdictional issue, we turn now to the defendants' nonconstitutional claims. See *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 635 n.15, 904 A.2d 149 (2006) ("[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]). First, the defendants claim that the trial court improperly concluded that a guarantee is a "lawful source of income" within the meaning of §§ 46a-64c and 46a-63 (3). See footnote 2 of this opinion. The defendants acknowledge that a guarantee is a benefit, but contend that, insofar as a guarantee does not "involve money," it does not qualify as "income." The commission replies that a guarantee is "housing assistance," and accordingly, is expressly included within the definition of a

---

[9] The defendants also raise a claim regarding the propriety of the June 4, 2009 hearing on the subject of attorney's fees. The defendants have styled their claim as one asserting that the trial court abused its discretion in ordering the hearing, but their argument in support of that claim can be accurately and completely distilled to unfounded accusations of laziness on the part of the trial court and thinly veiled suggestions that the trial court scheduled the hearing in a deliberate attempt to subvert the requirements of § 51-183b. We will discuss these claims no further than to note that we find them wholly unpersuasive.

lawful source of income in § 46a-63 (3). We agree with the commission.

The question of whether the term "lawful source of income" encompasses a guarantee is one of statutory interpretation. Statutory interpretation presents a question of law, "over which we exercise plenary review. . . . The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Grady* v. *Somers*, 294 Conn. 324, 332–33, 984 A.2d 684 (2009).

Section 46a-64c prohibits housing discrimination on the basis of a number of characteristics, including a "lawful source of income . . . ." In accordance with the requirements of § 1-2z, we look to related statutes in construing this provision. Section 46a-64c is preceded by a definitional statute, which defines " '[l]awful source of income' " as encompassing, inter alia, "income derived from . . . housing assistance . . . ."

General Statutes § 46a-63 (3). It is undisputed that a guarantee is a form of housing assistance. Whether a guarantee constitutes a lawful source of income under § 46a-64c, therefore, turns on whether guarantees constitute income within the meaning of the statutory scheme.

To answer this question, we begin with the statute's legal meaning. See General Statutes § 1-1 (a); see also *State* v. *Sunrise Herbal Remedies, Inc.*, 296 Conn. 556, 568, 2 A.3d 843 (2010) ("Words with a fixed legal or judicially settled meaning must be presumed to have been used in that sense. . . . In ascertaining legislative intent [r]ather than using terms in their everyday sense, [t]he law uses familiar legal expressions in their familiar legal sense." [Internal quotation marks omitted.]). "[I]ncome" is defined as "[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the like." Black's Law Dictionary (9th Ed. 2009). In turn, "payment" is defined as "[p]erformance of an obligation by the delivery of money *or some other valuable thing* accepted in partial or full discharge of the obligation. . . . The money *or other valuable thing* so delivered in satisfaction of an obligation." (Emphasis added.) Id. Accordingly, to constitute income, something does not need to be money; rather, it can be something else of value.

Insofar as the legal definition of payment contemplates the thing of value being satisfaction of some "obligation," we note the inclusion of "Social Security . . . housing assistance . . . or public or state-administered general assistance"; General Statutes § 46a-63 (3); in the definitional list of lawful sources for income. This indicates that the legislature views income as including within its scope the obligation of the state to provide certain forms of assistance. See also *Commission on Human Rights & Opportunities* v. *Sullivan*

*Associates*, 250 Conn. 763, 765, 739 A.2d 238 (1999) (section 8 housing vouchers constitute lawful source of income).

Although this analysis strongly indicates that a guarantee does constitute a lawful source of income, we nevertheless acknowledge that the defendants' position that income must "involve money" is a reasonable interpretation. Income commonly is used consistently with the defendants' narrower view. See, e.g., The American Heritage New Dictionary of Cultural Literacy (3d Ed. 2005) (defining income as "[t]he amount *of money* received during a period of time in exchange for labor or services, from the sale of goods or property, or as a profit from financial investments" [emphasis added]). Moreover, most benefits provided by the state come in the form of a money payment, rather than a guarantee. Accordingly, we conclude that the statute is susceptible to two competing interpretations, and in accordance with § 1-2z, we consider the legislative history of § 46a-64c. Our review of that legislative history has revealed unusually conclusive evidence that indisputably settles the question before us.

In keeping with the common practice of the General Assembly, when the bill that ultimately became § 46a-64c was presented to the House of Representatives for approval, the sponsor was given the opportunity to summarize its contents. In so doing, the sponsor stated that the "bill defines lawful sources of income that would be protected [from discrimination], and they are: [inter alia] . . . security deposits that are provided under the [d]epartment of [h]uman [r]esources [s]ecurity [d]eposit [p]rogram."[10] 32 H.R. Proc., Pt. 25, 1989 Sess.,

[10] Pursuant to No. 93-262 of the 1993 Public Acts, the department of human resources was brought under the auspices of the department of social services, which now administers the guarantee program. See footnote 3 of this opinion. The reference in the legislative history to the "[s]ecurity [d]eposit [p]rogram" refers to the predecessor to the current guarantee system.

p. 8776, remarks of Representative Lynn H. Taborsak. Our review of the remaining legislative history and genealogy of the statute has revealed no evidence to support a contrary interpretation. Such clear evidence of legislative intent, particularly when considered in concert with the weight of the textual evidence, leaves no doubt that guarantees are clearly within the scope of lawful sources of income under §§ 46a-63 (3) and 46a-64c.

## III

The defendants next claim that the guarantee Arnold provided to them was invalid because it lacked a required signature, namely, that of the regional manager of the department of social services (department) or a shelter director.[11] They further contend that the trial court improperly concluded that the guarantee's validity was irrelevant to the commission's discrimination claim. In their brief to this court, however, the defendants concede that they rejected Arnold's guarantee "because [they] expected the security deposit in cash,"[12] not because of its possible invalidity. Nevertheless, the defendants claim that the actual reason for the discrimination does not matter because the guarantee was ultimately unenforceable.

The commission claims that the absence or existence of a separate, potentially nondiscriminatory justification for rejecting the relators as tenants is irrelevant, unless that reason actually caused the defendants to

[11] The guarantee presented to the defendants includes the following statement: "This agreement is not valid until approved and signed by the [department] [r]egional [m]anager or the [s]helter [d]irector." It is undisputed that the guarantee was signed by Kenneth Smith, who was neither a regional manager nor a shelter director, who was authorized to do so by the regional manager of the department office in accordance with an apparent department policy.

[12] The defendants also apparently concede that they relied on an impermissible reason to reject the guarantee, stating in their brief to this court that they "rejected the [guarantee] for the wrong reason . . . ."

reject the relators. Accordingly, the commission claims the trial court was correct in concluding that "if the court finds that [the defendants] acted in a manner that was not in accordance with the statute . . . whether or not this agreement is valid isn't really germane to the issue that is in front of the court." We agree with the commission.

Whether the question of discrimination is impacted by the validity of the guarantee presents a question of law, over which we exercise plenary review. *Maturo* v. *Maturo*, 296 Conn. 80, 88, 995 A.2d 1 (2010). Certain well settled principles bear on this question.

In *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 596 A.2d 396 (1991), this court considered a case with nearly identical facts relevant to the issue of discrimination. In that case, a prospective tenant introduced evidence that proved that she had been denied an apartment for a prohibited discriminatory reason. Id., 195. In our review of the trial court's judgment, we noted that the "case that sets forth the standard to be applied where there is direct evidence of discrimination is *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)."[13] *Miko* v. *Commission on Human Rights & Opportunities*, supra, 205. We characterized that standard as follows: "[W]here the plaintiff had introduced sufficient evidence that prohibited discrimination had played a motivating part in her rejection . . . the [discriminator] had to establish by a *preponderance of the evidence* that a legitimate reason would have led to the same decision in the absence of discrimination. . . . The critical inquiry is whether the discriminatory motive was a factor in the decision *at the moment it was made.*

---

[13] We note that, while *Price Waterhouse* was a plurality opinion, this court adopted its suggested approach in the majority opinion in *Miko* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 206–207; it is therefore binding upon this court.

. . . An alleged discriminator may not prevail in a [direct evidence] case by offering a legitimate and sufficient reason for its decision *if that reason did not motivate it at the time of the decision.*"[14] (Citations omitted; emphasis in original; internal quotation marks omitted.) Id.

In the present case, the commission produced, via Arnold's testimony and the defendants' own concessions, direct evidence of the fact that prohibited discrimination was the motivating factor for the defendants' rejection of the relators.[15] The defendants not only failed to prove, by a preponderance of the evidence, that the rejection was in fact motivated by the alleged invalidity of the guarantee, but they also openly admitted that they discovered that purported defect only *after* having refused to allow Arnold to take possession of the apartment. Accordingly, it is factually impossible that this claimed permissible motivation for rejection played any role in the defendants' discriminatory decision. We therefore conclude that the trial court properly determined that evidence related to the validity of the guarantee is irrelevant to the question of whether the defendants engaged in impermissible discrimination.

---

[14] The defendants attempt to distinguish *Price Waterhouse*, suggesting that it stands for the proposition that "if two alternative motives exist when the alleged discrimination occurs, one nondiscriminatory . . . the other discriminatory . . . the [alleged discriminator] must prove its action . . . was based on the nondiscriminatory motive. It doesn't matter that the [discriminator] later discovers a nondiscriminatory reason." We can make neither heads nor tails of this claim; the only appreciable difference between the two scenarios is that the factual inquiry is far simpler in the case where the discriminator is unaware of any legitimate justification for his discrimination—in such a case, as here, there can be no question that he was motivated by prohibited discriminatory animus.

[15] In addition to the defendants' repeated acknowledgments in their brief of their rejection of the relators due to the absence of a cash security deposit, we also note that, in the joint stipulation of facts submitted to the trial court, the parties agree that "[Jean] Forvil rejected the [guarantee] because he required and expected a cash security deposit."

## IV

The defendants also claim that the trial court improperly denied their motion to compel the commission to produce various documents from the department, which administers the guarantee program. The trial court had sustained the commission's objection to that motion, in which the commission had asserted that it could not provide documents under the control of a wholly separate state agency, and that there had been no showing that the commission could obtain the requested information with any greater facility than the defendants. We conclude that the defendants have inadequately briefed this claim, and accordingly, we decline to consider it.

In spite of their heavy burden to establish that this ruling was an abuse of discretion; *Blumenthal* v. *Kimber Mfg., Inc.*, 265 Conn. 1, 7, 826 A.2d 1088 (2003); the defendants' single page of briefing on this claim includes no citations to any authority, even for the most general of principles. Furthermore, three of the five paragraphs on that page address either appellate review or the factual background for the claim, leaving only two paragraphs that can be characterized generously as argument. Therein, the defendants suggest that the principle that a state agency cannot satisfy discovery requests for information in control of another state agency is: (1) analogous to a corporation's design department being unable to satisfy a discovery request against the corporation's sales department; and (2) an unjust position that "seriously stacks the deck against individual litigants if they choose, as is their right, to fight city hall." Accordingly, because the defendants "do not cite any authority or develop their claim with analysis, we conclude that the claim is inadequately briefed. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003) ([a]nalysis, rather than mere abstract

assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly . . . ). We therefore will not address it." (Internal quotation marks omitted.) *Hartford/Windsor Healthcare Properties, LCC* v. *Hartford*, 298 Conn. 191, 194 n.4, 3 A.3d 56 (2010).

## V

Having resolved the defendants' nonconstitutional claims in favor of the commission, we turn now to the defendants' constitutional claims. The defendants claim that requiring landlords to accept a guarantee in lieu of a cash security deposit deprives "certain" landlords of equal protection of the law. Specifically, the defendants claim that "the law treats them differently from landlords fortunate enough not to be approached by a [department] client." Aside from this offensive presentation of their claim,[16] the defendants simply cite several cases explaining the nature of equal protection and make three observations about why a cash security deposit could be preferable to a guarantee[17]—the defen-

[16] In their brief, the defendants observed that "[t]he trial court stated that were she a landlord she would accept [a guarantee] which in this writer's opinion makes her an unsophisticated landlord." We note only that it is anything but unsophisticated for a judge of the Superior Court of Connecticut to indicate that she would follow the laws of the state of Connecticut. See Conn. Const., art. XI, § 1 (judge of Superior Court swears oath to "faithfully discharge, according to law" his or her duties as judge).

[17] While it is outside the province of this court to consider the factual accuracy of the purported disadvantages of guarantees, we note that none of them implicates a violation of the laws of our state. The same cannot be said, however, for the purported advantage of a cash deposit to which the defendants' counsel alluded at oral argument before this court. When asked how the defendants were practically affected by accepting a guarantee rather than cash, counsel suggested: "I think if I had a dollar for every landlord that comingles security deposits, I'd be pretty well off." While we do not know whether counsel is correct in this characterization of the state's landlords, we note that such conduct is expressly prohibited by General Statutes § 47a-21 (h), and we express our hope that counsel was incorrect in characterizing the defendants' intentions, as well as our hope that the landlords of the state do, in fact, conduct themselves in accordance with our laws.

dants undertake no analysis or discussion of the alleged inequalities under the law. At no point do the defendants indicate whether they raise their claim under the federal constitution or the Connecticut constitution, nor do they articulate what level of scrutiny they believe to be appropriate for consideration of their claim. In short, other than a bald assertion that the law denies them equal protection, the defendants fail to put forward a single element of an equal protection claim. We therefore consider this claim inadequately briefed and decline to address it. See *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, supra, 298 Conn. 194 n.4; *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 266 Conn. 120.

## VI

The defendants also claim that we should declare § 46a-64c to be unconstitutional as impermissibly vague. The defendants' claim appears to be that, insofar as two state agencies interpret the statute's requirements to mean different things, the statute is per se vague. In support of this position, the defendants claim that the department views the acceptance of a guarantee by the landlord to be voluntary, while the commission views that acceptance as mandatory. In response, the commission contends that the statute is not vague, and that the meaning of "lawful source of income" is sufficiently clear to establish that refusal to accept a guarantee constitutes prohibited discrimination. We conclude that the defendants also have inadequately briefed this claim.

It is clear from our law that a party bears a heavy burden in asserting a challenge to a statute on vagueness grounds, or indeed, on any constitutional grounds. See *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 458–59, 984 A.2d 748 (2010). In support of their claim, the defendants

cite several cases that establish the general meaning of vagueness, claim that two state agencies have competing understandings of the statute, and reiterate their claim that "income" does not include a noncash benefit such as a guarantee. In their approximately one page of discussion of this claim, the defendants neither articulate a claim that they were denied proper notice of what conduct was prohibited by § 46a-64c[18] nor discuss the application of the law of vagueness to the facts of this case. The defendants also do not point to any authority for the proposition that a statute is per se vague when state agencies disagree on its interpretation. In the absence of these basic components of a claim against a statute's constitutionality, we conclude that the defendants have inadequately briefed the issue of the statute's vagueness. Accordingly, we will not address the claim. See *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, supra, 298 Conn. 194 n.4; *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 266 Conn. 120.

## VII

Finally, the defendants claim that the trial court awarded excessive compensatory damages to the relators for their alleged emotional distress. The defendants bring this claim under the following theories: (1) the $7500 compensatory damages award for each of Arnold's children was "pure speculation" because the children did not testify at the trial and Arnold did not describe their emotional distress in her testimony; and

---

[18] Insofar as the defendants never mention arbitrary or discriminatory enforcement, and insofar as our review of the record reveals nothing even remotely close to a colorable basis for a claim on those grounds, we assume their vagueness claim must be predicated upon notice grounds. See *Board of Selectmen* v. *Freedom of Information Commission*, supra, 294 Conn. 458–59 ("any party challenging the statute on vagueness grounds bears the burden of demonstrating beyond a reasonable doubt that he or she had inadequate notice of what was prohibited or that he or she has been the victim of arbitrary and discriminatory enforcement").

(2) the $30,000 compensatory damages award to Arnold was wholly inconsistent with damages awards in other cases.[19] We disagree with these contentions.

We begin by setting forth our standard for reviewing a trial court's assessment of compensatory damages. "The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages. . . . [W]e cannot disturb the decision of the trial court unless there are considerations of the most persuasive character. . . . The trial judge has a broad legal discretion and his action will not be disturbed unless there is a clear abuse. . . . The evidence offered at trial must be reviewed in the light most favorable to sustaining the verdict." (Citations omitted; internal quotation marks omitted.) *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 174–75, 530 A.2d 596 (1987).

Our inquiry into whether the damages award in this case shocks the sense of justice must begin with the defendants' leading argument that "damage[s] awards are subjective with women perhaps placing greater emphasis on emotional damage than men." We take this opportunity to remind litigants that "we . . . deplore gratuitous use of gender stereotypes as part of any argument"; *State* v. *Williams*, 231 Conn. 235, 247, 645 A.2d 999 (1994), overruled in part on other grounds by *State* v. *Murray*, 254 Conn. 472, 487, 757 A.2d 578 (2000); and we decline to explore further this contention, which

---

[19] The defendants also contend in their brief that, even if the relators are entitled to recovery, any damages should be based on breach of contract rather than for discriminatory practices. This contention is unsupported by further discussion or references to authority, and its import is, in any event, unclear to this court. Insofar as this assertion and an incomplete sentence immediately thereafter constitute the whole of the defendants' attention to this issue, we view it as abandoned, and we decline to address it further.

is but one of many "indecorous epithets and irrelevant episodes" to be found in the defendants' brief and oral argument. *Ravitch* v. *Stollman Poultry Farms, Inc.*, 165 Conn. 135, 138 n.2, 328 A.2d 711 (1973).

Turning to the reasonableness of the compensatory damages awards, we note that the trial judge made no specific findings of fact with respect to any of the damages. "[B]ecause the [defendant] elected not to file a motion for articulation to illuminate further the basis for the compensatory damages award, this court can only speculate as to how and why the trial court arrived at that sum." *Smith* v. *Snyder*, 267 Conn. 456, 467, 839 A.2d 589 (2004). Moreover, since "[w]e repeatedly have stated that it is the appellant's responsibility to provide an adequate record for review"; id.; the irony of the defendants' complaint that the record appears speculative does not escape us.

In crafting its compensatory damages award, the trial court could have chosen to credit Arnold's testimony regarding the suffering that she and her children endured as a result of the defendants' discrimination as well as her expressions of emotional distress. Arnold testified that, at the time of the incident at issue, she was receiving Social Security disability benefits because of anxiety. She further testified that she had recently moved to Connecticut hoping to "start life all over anew," that the apartment she sought to rent from the defendants represented "everything [she] was looking for," in a neighborhood that was "quiet" and "safe," and that her children had responded to the apartment with excitement. Regarding her reaction to being rejected by the defendants', Arnold testified: "I felt like my whole world had shattered . . . . So I was crying, I was angry . . . . I had to go on my medication . . . for my anxiety attacks. I—I didn't—I just didn't know what to do. . . . I felt like I was failing my kids." Arnold's testimony indicated that her children were also

unsettled by the defendants' actions. At the alternative apartment that Arnold found in the short period between the defendants' refusal to rent to her and the termination of her temporary housing, she and her children lived in tight, unclean quarters in close proximity to drug dealing and gun violence. Arnold and her children sometimes slept on the floor after hearing gunshots, and, in one instance, a gunfight occurred outside the apartment door immediately after one of Arnold's children returned from an errand. In light of the wide latitude granted to trial courts in determining compensatory damages, the aforementioned facts available to the court, and the limited record before us, we cannot conclude that the compensatory damages award reflects an abuse of judicial discretion.

The defendants' claims to the contrary are unavailing. With respect to the compensatory damages awarded to the children, the defendants claim that the award is improperly speculative because no evidence of their emotional distress was introduced at trial. On this limited record, we do not reach any conclusions regarding the general requirements for demonstrating emotional harm.[20] We do hold that, under the facts of this case, the trial court reasonably could have concluded that the events endured by Arnold's children, most notably the recurring threat and actual occurrence of gun violence, "by their very nature are likely to cause mental and emotional distress . . . so there arguably is little

---

[20] The United States Supreme Court has held that, "[a]lthough essentially subjective, genuine injury [of emotional harm] may be evidenced by one's conduct and observed by others. Juries must be guided by appropriate instructions, and an award of damages must be supported by competent evidence concerning the injury." *Carey* v. *Piphus*, 435 U.S. 247, 264 n.20, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978). Dealing with the question of competent evidence, the United States Court of Appeals for the Seventh Circuit has suggested that "[h]umiliation can be inferred from the circumstances as well as established by the testimony." *Seaton* v. *Sky Realty Co.*, 491 F.2d 634, 636 (7th Cir. 1974).

reason to require proof of this kind of injury . . . ."
*Carey* v. *Piphus,* 435 U.S. 247, 262, 98 S. Ct. 1042, 55
L. Ed. 2d 252 (1978); see *Johnson* v. *Hale,* 940 F.2d
1192, 1193 (9th Cir. 1991) ("Compensatory damages
may be awarded for humiliation and emotional distress
established by testimony or inferred from the circum-
stances. . . . No evidence of economic loss or medical
evidence of mental or physical symptoms stemming
from the humiliation need be submitted." [Citation
omitted.]). The record before us thus contains sufficient
evidence for the trial court to conclude that the children
suffered emotional harm. Noting again that the defen-
dants failed to supplement this limited record by filing
a motion for articulation, we defer to the trial court's
judgment. See *Smith* v. *Snyder,* supra, 267 Conn. 467
(upholding damages award where "[plaintiff's] testi-
mony was vague at best" but defendant had failed to
create adequate record for review).

The defendants also claim that the compensatory
damages awarded to Arnold are disproportionate to
awards in other cases. In support of this claim, the
defendants point to an opinion by the United States
District Court for the District of Connecticut discussing
cases in which emotional distress awards were remitted
on appeal. See *Schanzer* v. *United Technologies Corp.,*
120 F. Sup. 2d 200, 217–18 (D. Conn. 2000). A review
of the decisions cited in *Schanzer* reveals no consistent
rule for determining what will "shock the judicial con-
science"; id., 219; and the award in the present case
falls well below the upper threshold for reasonable
damages articulated in *Schanzer.* Id. ("[T]he absolute
maximum amount that would be permitted to stand and
not shock the judicial conscience as a compensatory
damage[s] award for [the] plaintiffs is $40,000 for [one
plaintiff] and $45,000 for [the other plaintiff]. These
amounts approach, but do not reach, the level of exces-
sive."). The defendants also rely on *Seaton* v. *Sky Realty*

*Co.*, 491 F.2d 634, 636 (7th Cir. 1974), an opinion of the United States Court of Appeals for the Seventh Circuit approving a $500 damage award for humiliation stemming from a realtor's racial discrimination. Nothing in *Seaton* indicates that a larger award would have been inappropriate, and it offers no grounds for concluding that the award in the case at issue does not *also* "[fall] somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case . . . ." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 450, 815 A.2d 119 (2003). The damages award in this case falls within the broad contours of the trial judge's discretion and does not shock the judicial conscience of this court.

The judgment is affirmed.

In this opinion the other justices concurred.