******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# INDEPENDENT PARTY OF CT—STATE CENTRAL ET AL. *v.* DENISE W. MERRILL, SECRETARY OF THE STATE, ET AL.
## (SC 20165)

Robinson, C. J., and Palmer, Mullins, Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Pursuant to statute (§ 9-372 [6]), " '[m]inor party' means a political party or organization which is not a major party and whose candidate for the office in question received at the last-preceding regular election for such office . . . at least one per cent of the whole number of votes cast for all candidates for such office at such election . . . ."

Pursuant further to statute (§ 9-374), "no authority . . . having jurisdiction over the conduct of any election shall permit the name of a candidate of [a minor] party for any office to be printed on the official ballot unless at least one copy of the party rules regulating the manner of nominating a candidate for such office has been filed in the office of the Secretary of the State at least sixty days before the nomination of such candidate," and those "[p]arty rules shall not be effective until sixty days after [their] filing . . . ."

The plaintiffs, a faction of this state's Independent Party based in Danbury and its officers, brought the present action seeking, inter alia, a judgment declaring that the statewide Independent Party is governed by a set of bylaws drafted in 2006 and not, as claimed by the defendants T and R, the officers of another faction of this state's Independent Party based in Waterbury, a separate set of bylaws drafted in 2010. In 2003, T and certain other individuals formed the Waterbury faction for the purpose of endorsing candidates for municipal elections. In 2006, the head of the Danbury faction of this state's Independent Party, F, joined with T in order to petition for statewide offices but failed to obtain a sufficient number of signatures to gain access to the ballot. Later that year, F and L, together with one other person, filed a set of bylaws with the named defendant, the secretary of the state, along with a form designating themselves as officers of the State Central Committee of the Independent Party of Connecticut. In 2008, F and T again joined together, this time with the goal of supporting the candidacy of Ralph Nader for president of the United States. In order to accomplish this, F and T filed a form with the secretary of the state designating themselves as the agents of the Independent Party and agreed to the creation of a new set of statewide bylaws. After Nader received greater than one percent of the votes cast in the 2008 presidential election, the secretary of the state certified the Independent Party as a statewide minor party pursuant to § 9-372 (6). T, along with one other person, subsequently drafted a new set of bylaws, which was later unanimously ratified in a publicly noticed meeting of registered Independent Party members in 2010. F received an advance copy of the proposed bylaws, attended that meeting, and did not object to them. The 2010 bylaws were then filed with the secretary of the state, and no objection was received within the sixty day period required under § 9-374. After a dispute in 2012, the Waterbury faction filed a separate action seeking placement of its candidates on the ballot in the general election but then withdrew its action after the trial court denied its motion for a temporary order of mandamus. Notwithstanding that separate action, the 2010 bylaws were used to govern caucuses, the nomination of candidates, and the election of party officers from 2010 to 2014 without objection by the plaintiffs. In 2016, the Danbury and Waterbury factions held separate events for the purpose of nominating Independent Party candidates, and, when competing nominations were made, the secretary of the state declined to accept either nomination for placement on the ballot. On the eve of trial in the present case, T and R filed a motion for permission to amend their answer and assert a counterclaim seeking a judgment declaring that they were the rightful officers of the Independent Party, along with certain special defenses alleging, inter alia, that the plaintiffs had waived their right to contest

the 2010 bylaws. The trial court granted T and R's motion following the close of evidence. Shortly before a memorandum of decision was due pursuant to the statute (§ 51-183b) requiring trial judges to render judgment within 120 days of the date that the trial concluded, the trial court requested a sixty day extension from the parties. The plaintiffs objected to that request, and, shortly thereafter, the trial court ordered supplemental briefing and arguments regarding whether the court had subject matter jurisdiction over the case. The trial court subsequently issued a written memorandum of decision in which it concluded that it had jurisdiction and found the facts in favor of T and R on the both the complaint and the counterclaim. In reaching its conclusion, the trial court rejected the plaintiffs' argument that the 2012 decision denying the request for a temporary order of mandamus was entitled to preclusive effect. The trial court further found that T and R had proven, by a preponderance of the evidence, that the plaintiffs have waived any right they may have had to challenge the validity of the 2010 bylaws. The trial court rendered judgment for the defendants and ordered the secretary of the state to accept only those candidate endorsements made pursuant to the 2010 bylaws. From that judgment, the plaintiffs appealed. *Held*:

1. The trial court issued a timely memorandum of decision under § 51-183b, and, accordingly, that statute did not operate to deprive the trial court of personal jurisdiction over the parties; notwithstanding the plaintiffs' objection to the trial court's request for an extension, the trial court's order requiring supplemental briefing and arguments to address a colorable issue pertaining to subject matter jurisdiction, which was issued before the 120 day decision period lapsed, had the effect of stopping the decision period and restarting it after supplemental arguments were heard.

2. The trial court properly determined that, under § 9-374, the 2010 bylaws were the effective party rules of the statewide Independent Party; although there was nothing in the language of § 9-374 that would have expressly precluded the filing of party rules before Nader received 1 percent of the vote as a statewide candidate in 2008, other related statutory provisions, including the statutory definition of "minor party" set forth in § 9-372 (6), indicated that the Independent Party did not exist as a minor party for purposes of state election law until 2008, and, therefore, the 2006 bylaws simply had no effect with respect to the obligations of the secretary of the state.

3. The trial court properly declined to give preclusive effect to the decision denying the Waterbury faction's motion for a temporary order of mandamus in the 2012 action; that decision, which was based on a finding that the Independent Party did not follow the amendment procedures provided in the 2006 bylaws in adopting the 2010 bylaws, did not constitute a final judgment under the doctrine of res judicata or collateral estoppel, as it was issued on an expedited basis and specifically emphasized that it was tentative in nature and not a final judgment on the merits.

4. The trial court's factual finding, made in connection with the defendants' special defense of waiver, that the plaintiffs had waived any objection to the use of the 2010 bylaws to govern Independent Party proceedings was not clearly erroneous; there was ample evidence in the record to support the trial court's factual finding, as the trial court properly credited evidence that T and F actively worked together to form a statewide party in 2008, filed joint forms on behalf of the Independent Party, and discussed the proposed 2010 bylaws, which were later unanimously adopted, filed with the secretary of the state, and used without objection by the plaintiffs.

5. The plaintiffs could not prevail on their unpreserved constitutional claim that the trial court's decision improperly interfered with the Independent Party's right to choose its own candidates, as the plaintiffs induced the claimed error by naming the secretary of the state as a defendant and seeking an order mirroring the relief ultimately awarded.

6. The trial court did not abuse its discretion in granting T and R's late request to amend their answer, as that amendment did not prejudice the plaintiffs; the plaintiffs did not claim that they would have litigated the case differently if the court had not permitted the amendment, that they were deprived of the time necessary to respond to the amendment, or that the amended answer confused the issues in the case.

Argued October 19, 2018—officially released February 19, 2019

*Procedural History*

Action for a judgment declaring, inter alia, that certain bylaws are the validly adopted and currently effective party rules of the statewide Independent Party, and for other relief, brought to the Superior Court in the judicial district of Hartford, where Michael Duff was substituted as a plaintiff and the defendant Michael Telesca et al. filed a counterclaim; thereafter, the case was tried to the court, *Hon. A. Susan Peck*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the defendants on the complaint and for the defendant Michael Telesca et al. on the counterclaim, and the plaintiffs appealed. *Affirmed.*

*Eliot B. Gersten*, with whom was *Johanna S. Katz*, for the appellants (plaintiffs).

*Maura Murphy Osborne*, assistant attorney general, with whom, on the brief, was *George Jepsen*, former attorney general, for the appellee (named defendant).

*William M. Bloss*, with whom were *Alinor C. Sterling* and *Emily B. Rock*, for the appellees (defendant Michael Telesca et al.).

*Opinion*

ROBINSON, C. J. This appeal is the latest battle in the war for control over the state's Independent Party between its Danbury faction, which is led by the plaintiffs, the Independent Party of CT—State Central and its officers, Michael Duff, Donna L. LaFrance, and Roger Palanzo,[1] and its Waterbury faction, which is led by two of the defendants, Michael Telesca and Rocco Frank, Jr. The plaintiffs appeal[2] from the judgment of the trial court, rendered after a bench trial, for Telesca and Frank on the complaint and the counterclaim in the present action, which both sought declaratory and injunctive relief. Specifically, the trial court ordered the named defendant, Secretary of the State Denise W. Merrill,[3] to accept candidate endorsements made pursuant to the Independent Party's 2010 bylaws (2010 bylaws), which, in effect, gave the Waterbury faction control over the Independent Party's statewide nominations. There are two principal issues among the plaintiffs' plethora of claims in the present appeal. First, we consider whether the trial court's order of supplemental briefing and oral argument concerning its subject matter jurisdiction, issued just prior to the 120 day decision deadline pursuant to General Statutes § 51-183b,[4] and after the plaintiffs' objection to the trial court's request for an extension, preserved its personal jurisdiction over the parties by stopping and later restarting the decision period. The second principal issue is whether the trial court properly determined that General Statutes § 9-374,[5] which requires the filing of party rules before the name of a candidate endorsed by a minor political party may be printed on an election ballot, rendered the 2010 bylaws controlling, as opposed to bylaws that the Danbury faction had filed with the Secretary in 2006 (2006 bylaws) prior to the Independent Party's receiving the 1 percent of statewide votes necessary to confer minor party status. Because we conclude that the order of supplemental briefing and argument opened the 120 day decision period and later restarted it, thus rendering the trial court's decision timely under § 51-183b, and also conclude that the trial court properly construed § 9-374, we affirm the judgment of the trial court.[6]

The record reveals the following relevant facts, as found by the trial court, and procedural history. The genesis of the current Independent Party dates to 2003, when Telesca and others formed the Waterbury Independent Party (Waterbury party), "to run candidates for local office as an alternative to the major parties." The Waterbury party "endorsed a full slate of candidates for municipal elections in Waterbury and [saw] eight people [elected] to office, each of whom received more than 1 percent of the vote in [his or her] individual [race]. Because the candidates received at least 1 percent of the vote in each of those races, the Waterbury

[party] was eligible for minor party status for those offices. Thereafter, Waterbury electors could register as Independent Party members for local elections. After the 2003 Waterbury municipal elections, the [Secretary] sent a letter to the Waterbury [party] requesting that it submit party rules. In 2004, the Waterbury [party] drafted bylaws on how to conduct caucuses and created a nominating process for future races. Telesca's goal was to build a new statewide third party to help people get ballot access around the state. The Waterbury [party] bylaws were filed with the [Secretary and the] Waterbury town clerk . . . ."

"In 2004, the Waterbury [party] decided to run candidates in races for state representative and state [senator] in the Waterbury area. . . . Around this time, Telesca learned about a separate Independent Party that had been formed in Danbury headed by [Robert] Fand that had reserved the name ['Independent Party for the 30th Senate District' (Danbury party)]. Because the Danbury [party] had already reserved the party designation of Independent Party for the 30th Senate District, the Waterbury [party] was not allowed to nominate a candidate for that election. In 2004, Telesca and Fand reached an agreement that the Waterbury [party] would not operate in Danbury and the Danbury [party] would not operate in Waterbury. . . .

"In 2006, the Waterbury [party] attempted to reserve the name 'Independent Party' statewide but was not able to do so because there were local parties using the name 'Independent' in both Danbury and Waterbury. The [Secretary] would not allow two different parties with any part of the same name on the ballot at the same time. In 2006, Telesca and [his colleague, John] Mertens learned from the [Secretary] that they needed to get the local independent parties to come together in order to . . . petition for statewide offices. In 2006, Telesca and Fand joined together and signed and filed a form [ED-601[7] with the Secretary] as members of the Independent Party Designation Committee, but they failed to obtain enough signatures to get ballot access for any statewide office. As a result, there was no statewide minor party established in that year. . . .

"In September 2006, Fand, [John L.] Dietter, and LaFrance filed a form ED-48 with the [Secretary] designating themselves as the three members of the party committee for the 'Independent Party of CT—State Central.' . . . At the same time, these individuals filed the 2006 bylaws, which consisted of one page [entitled] 'Party Rules Amended.' . . . The introductory paragraph of those rules states that the committee 'adopts the following rules for the establishment of local committees and nomination of candidates.' . . . The final paragraph of the 2006 bylaws . . . indicates that the rules were passed unanimously at the meeting of the 'State Central Committee of the Independent Party of

Connecticut on [September 27, 2006],' and is signed by . . . Dietter [as] Chairman . . . LaFrance [as] Treasurer, and . . . Fand [as] Deputy Treasurer . . . ." (Citations omitted; footnote added.)

"In 2008, Fand and Telesca [again] joined together to create a statewide Independent Party. There were other Independent Party chapters in the state at this time, including ones in Winsted and Milford. Telesca assisted those chapters by providing information regarding the election process. The immediate goal in 2008 was to run Ralph Nader as a candidate for president . . . and achieve 1 percent of the vote, which would establish the Independent Party as a statewide minor party. See General Statutes § 9-372 (6).[8] In a joint effort to accomplish this goal, Telesca and Fand both signed and filed [a] form ED-601 . . . as the designated agents of the Independent Party. The form designated the name Independent Party not only for president, vice president, and electors, but also for state senate districts 24, 28, and 11, state assembly districts 110 and 96, United States congressmen for the third and fifth districts, and for several registrar of voters and probate judge races." (Footnote added.)

The trial court credited Telesca's testimony that, "because there were different rules for the various local parties in the state who controlled the Independent Party line for their localities, he and Fand agreed that they would need to create a new set of bylaws to accomplish their joint goal of creating a statewide minor party. Without a statewide party, a local Independent Party could oppose a statewide candidate for any office by reserving the same or a similar party designation for [its town]. Running . . . Nader for president provided a clear path toward garnering 1 percent of the vote and establishing a statewide minor party. Once Nader achieved over 1 percent of the vote in the 2008 presidential election, the [Secretary] certified the Independent Party as a minor party and notified all town registrars of voters of the Independent Party's new status as a statewide minor party. . . . Subsequently, anyone in the state could register to vote as a member of the Independent Party.

"Following the 2008 election, Telesca and Mertens drafted bylaws for the new statewide party. Telesca sent out [between] 700 [and] 800 postcards about a meeting to be held on March 20, 2010, concerning proposed bylaws to any registered member of the Independent Party who had voted in the last two elections. Mertens created a website and posted the proposed bylaws on it months in advance of the meeting. Telesca put an advertisement in the Hartford Courant announcing the meeting/caucus and gave advance notice to the [Secretary]. Telesca also sent Fand a postcard and gave him a copy of the proposed bylaws before the meeting, which Fand acknowledged. Telesca and [his colleague

Mary] Iorio met with Fand about the bylaws for the new statewide party before the meeting was held.

"On March 20, 2010, the Independent Party held a meeting in Waterbury of registered Independent Party members from around the state to ratify the [2010] bylaws for the new statewide party. At the meeting, Fand did not object either to the meeting, the idea of creating bylaws for the new statewide party, or the bylaws themselves, [and also did not] request any changes to the [2010] bylaws as proposed. There was an agenda for the meeting and a sign-up sheet. Only registered Independent Party members were allowed to vote on the [2010] bylaws. The vote to approve the bylaws was unanimous. The [2010] bylaws were filed with the [Secretary] on March 22, 2010 . . . . No objections were filed with the [Secretary] within sixty days of the filing date." (Citation omitted.)

"A caucus was held on August 21, 2010, to nominate Independent Party candidates for placement on the November 2, 2010 ballot. The 2010 bylaws were used to guide the nomination process at the caucus. The Independent Party got ballot access for statewide offices in 2010 by going through the petitioning process for candidates and by filing a form ED-601 . . . . The purpose of the caucus was to endorse candidates for certain offices and to ratify endorsements for other offices that had been made through the petitioning process. At a meeting held on August 21, 2010, immediately prior to the caucus, Telesca was authorized to preside over the statewide caucus, file all paperwork regarding the upcoming state elections, and to act as the agent and acting chairman of the Independent Party.

"Following the caucus, a document confirming the nominations and endorsements of the statewide Independent Party candidates for the 2010 election was filed with the [Secretary]. The document was signed by Telesca as presiding officer of the caucus, and LaFrance and Fand as agents of the Independent Party. . . . At the time, Fand and LaFrance constituted two-thirds of the [Independent Party of CT—State Central]. The [Secretary] subsequently approved a revised list of nominees on September 8, 2010. . . . All of the candidates were nominated pursuant to the 2010 bylaws. The new statewide Independent Party subsequently published a political advertisement showing its endorsed candidates for the 2010 election. . . .

"[On the basis of] the evidence presented at trial, in the 2010 election cycle, there was no conflict between the Waterbury and Danbury factions of the Independent Party." (Citations omitted.) Indeed, the trial court also found that there "was no evidence of conflict between the Waterbury and Danbury factions in the 2008, 2009, 2010, or 2011 election cycles. The 2006 bylaws were not used by the Independent Party to nominate anyone for president in 2008 or for statewide office in 2008,

2010, 2012, or 2014. The Danbury faction did not object to the caucuses held pursuant to the 2010 bylaws to nominate candidates for statewide office in either 2010 or 2012. On June 10, 2012, the Independent Party held a caucus to elect the officers of the statewide party.''

The conflict between the factions that led to litigation first developed in early 2012, when "Fand invited Telesca to a meeting with Danbury mayor Mark Boughton in an effort to gain Telesca's support for Boughton as the endorsed candidate of the Independent Party [for governor]. Boughton hoped to run for governor as the next nominee of the Republican Party. Telesca refused to give Fand his assurance, as chairman of the Independent Party, that he would endorse Boughton for governor and informed Fand that the Independent Party's endorsement of candidates was up to the party membership, not him. After that meeting, Telesca and Fand's relationship soured.

"Because Nader received more than 1 percent of the vote in 2008 presidential election, the Independent Party was able to nominate and endorse a candidate for the 2012 presidential election without having to go through the petitioning process. On August 21, 2012, the Independent Party held a caucus, conducted pursuant to the 2010 bylaws, to nominate and endorse a presidential candidate for 2012. The votes were limited to Independent Party members. At the caucus, Rocky Anderson was selected as the presidential nominee of the Independent Party. Although the 2006 bylaws reserved the right of the Danbury faction to make the Independent Party's nomination for president, the nomination for president was decided at the August 21, 2012 caucus [pursuant to] the 2010 bylaws without objection. Because Anderson failed to garner at least 1 percent of the vote for president, the Independent Party lost its presidential ballot line for the 2016 presidential election.

"In 2014, the Independent Party held a statewide caucus and nominated candidates pursuant to the 2010 bylaws. No one objected to the use of the 2010 [bylaws] for Independent Party nominations in the 2014 statewide elections. In 2015, local Independent Party chapters nominated candidates for municipal elections. In 2016, the Danbury faction and the Waterbury faction nominated different candidates for the Independent Party's state senate endorsement for one particular race. On August 23, 2016, the Danbury faction held an endorsement event at which nominations for president, vice president, United States Senate, United States House of Representatives, state senate and state [house] were made and thereafter filed with the [Secretary]. Notice of the meeting was given pursuant to General Statutes § 9-452a. . . . Telesca attended that endorsement meeting and voted no without comment when the nominees were presented for a vote. Telesca did not challenge how Duff, the presiding officer, con-

ducted the meeting. Nor did Telesca challenge anyone's right to vote at the meeting. Telesca filed a complaint with the State Elections Enforcement Commission against the current members of the [Danbury faction], Duff, LaFrance, Palanzo and others. The [Waterbury faction] also selected nominees at an event noticed for that purpose which were also filed with the [Secretary]. Where there were competing nominations, the [Secretary] did not accept either nomination for placement on the ballot. A major point of contention between the two factions is that the Waterbury faction believes that the Danbury faction is merely a proxy for the Republican Party and not truly representative of the Independent Party." (Citation omitted; footnote omitted; internal quotation marks omitted.)

The plaintiffs then brought the present action for declaratory and injunctive relief, which is the latest in a line of lawsuits arising from the conflict between the Waterbury and Danbury factions.[9] The case was tried to the court, *Hon. A. Susan Peck*, judge trial referee, on October 11, 17, and 18, 2017, with posttrial oral argument on March 23, 2018. Following supplemental briefing and oral argument with respect to whether the political question doctrine deprived the trial court of subject matter jurisdiction over this case, on August 21, 2018, the trial court issued a lengthy memorandum of decision in which it concluded that it had subject matter jurisdiction over this case[10] and rendered judgment for the defendants on the complaint.

With respect to its specific findings of fact and conclusions of law, the trial court first concluded as a matter of statutory interpretation that the 2010 bylaws were controlling under the statutory scheme governing minor parties, in particular §§ 9-374 and 9-372 (6), the "plain language of [which] indicates that a minor party does not exist in Connecticut until it designates a candidate for office who achieves 1 percent of the vote." The trial court further observed that, in contrast to the 2010 bylaws, which were created in a statewide process after Nader's nomination in 2008, the 2006 bylaws were filed with the Secretary at a time when "the party so-named had not achieved minor party status for any statewide office." Thus, the trial court determined that the "2006 bylaws are valid only to the extent they are recognized as such within the local committee. Although the plaintiffs filed the 2006 bylaws with the [Secretary], the filing of these rules merely allowed the [Danbury faction] to nominate local candidates and get them on an official ballot once they had attained 1 percent of the vote for a particular office. The 2006 bylaws did not automatically allow the [Danbury faction] to gain control of the statewide Independent Party after the 2008 presidential election."[11] (Footnote omitted.) Accordingly, the trial court concluded that "the only statewide Independent Party was created post-2008, and the 2010 bylaws are the only valid governing rules of that party."[12]

The trial court also rejected the plaintiffs' additional arguments about why the 2006 bylaws should be considered controlling. With respect to those relevant to this appeal, the trial court first considered the plaintiffs' conduct subsequent to the adoption of the 2010 bylaws and concluded that "the defendants have established by a preponderance of the evidence submitted in this case [their special defense alleging] that the plaintiffs have waived any right they may have had to challenge the validity of the 2010 bylaws." The trial court also rejected the plaintiffs' contention that a 2012 decision issued by Judge Mark H. Taylor in *Independent Party of Connecticut* v. *Dietter*, Superior Court, judicial district of Waterbury, Docket No. CV-12-5016387-S (September 28, 2012) (2012 Waterbury action), which had concluded "that the 2006 bylaws were the validly adopted Independent Party rules," was entitled to preclusive effect in the present case. The trial court reasoned that the 2012 Waterbury action was distinguishable because it did not concern statewide office, addressed only "a motion for a temporary order of mandamus, and . . . was [subsequently] withdrawn."

Accordingly, the trial court concluded that the plaintiffs "failed to establish by a preponderance of the evidence that they are entitled to the declaratory and injunctive relief requested in their second amended complaint," which would have given them control over the Independent Party. Instead, the trial court concluded that "the defendants . . . have established by a preponderance of the evidence that the 2010 bylaws are the validly adopted and operative bylaws of the Independent Party/Independent Party of Connecticut, filed pursuant to the requirements of § 9-374, and that [Telesca and Frank] are the duly elected officers of the Independent Party/Independent Party of Connecticut, and the individual plaintiffs are not. In addition, the court hereby declares that the 2006 bylaws apply only to the Danbury faction's local committee of the Independent Party. Finally, the court hereby declares and orders that the [Secretary] must accept only the nominations and endorsements of the Independent Party/Independent Party of Connecticut, made pursuant to the 2010 bylaws filed with the [Secretary] on March 22, [2010], or as may be amended, pursuant to . . . § 9-374." According to the plaintiffs, this order effectively "gives the Waterbury faction, under the leadership of Telesca and Frank, control of the statewide ballot line." This expedited appeal followed.[13] See footnote 2 of this opinion.

On appeal, the plaintiffs claim that the trial court (1) lost personal jurisdiction over this case when it failed to render judgment within 120 days as required by § 51-183b, (2) improperly construed § 9-374 in concluding that the 2010 bylaws are controlling, (3) improperly declined to give preclusive effect to Judge Taylor's deci-

sion in the 2012 Waterbury action, (4) committed clear error in finding that they had waived their objections to the 2010 bylaws, (5) crafted an order that violated their constitutional rights, and (6) abused its discretion in permitting the defendants to amend their answer to assert special defenses and counterclaims. Additional relevant facts and procedural history will be set forth in the context of each of these claims as necessary.

I

## WHETHER § 51-183B DEPRIVED THE TRIAL COURT OF PERSONAL JURISDICTION

Relying primarily on *Foote* v. *Commissioner of Correction*, 125 Conn. App. 296, 8 A.3d 524 (2010), and *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 577 A.2d 1047 (1990), the plaintiffs first claim that the trial court lost personal jurisdiction over this case because it failed to issue its decision within 120 days after oral argument and posttrial briefing as required by § 51-183b. The plaintiffs argue that their refusal to consent to the extension of time requested by the trial court deprived it of authority to issue the decision after 120 days had passed, and that countenancing the trial court's attempt to extend the deadline by raising subject matter jurisdictional questions at the last minute would remove the "teeth" from § 51-183b. The plaintiffs further argue that it was improper for the trial court to raise subject matter jurisdictional questions so late in the process because the parties had mentioned these issues repeatedly earlier in the proceedings. In response, the defendants contend that the trial court's decision was timely under § 51-183b because its order of supplemental briefing and argument concerning its subject matter jurisdiction, which was filed prior to the expiration of the original 120 day decision period, had the effect of stopping and then restarting the 120 day decision period after the court heard supplemental arguments on August 3, 2018. We agree with the defendants and conclude that the trial court's order requiring supplemental briefing to address a colorable jurisdictional issue had the effect of stopping the 120 day decision period, which then started anew after supplemental arguments, thus rendering its decision timely under § 51-183b.

The record reveals the following additional relevant facts and procedural history. On July 17, 2018, four days before the trial court's decision was due pursuant to § 51-183b, the trial court left voice mail messages for the parties, requesting a sixty day extension to issue the decision and asking them to file certain additional proposed orders. On July 18, 2018, the defendants filed proposed orders and did not comment as to timeliness. That same day, the plaintiffs filed a response declining to submit additional filings and refusing to waive the 120 day decision deadline, stating that a decision was needed to facilitate plans for the 2018 elections in light of the upcoming September 5, 2018 nomination filing

deadline pursuant to General Statutes § 9-452. On July 19, 2018, the trial court issued an order directing the parties to brief the question of whether the court had subject matter jurisdiction over the case under, inter alia, the political question doctrine, and to appear for oral argument on that issue on August 3, 2018. Following oral argument, on August 21, 2018, the trial court issued a comprehensive memorandum of decision addressing both the jurisdictional issue and the merits of the various claims made by the parties.

At the outset, we note that the plaintiffs' claim concerns the application of the case law interpreting § 51-183b to the undisputed facts, which raises a question of law over which our review is plenary. See, e.g., *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 546, 46 A.3d 112 (2012); see also *Gilmore* v. *Pawn King, Inc.*, 313 Conn. 535, 542, 98 A.3d 808 (2014) ("we do not write on a clean slate when this court previously has interpreted a statute" [internal quotation marks omitted]).

"[I]n past cases interpreting § 51-183b and its predecessors, we have held that the defect in a late judgment is that it implicates the trial court's power to continue to exercise jurisdiction over the parties before it. . . . We have characterized a late judgment as voidable rather than as void . . . and have permitted the lateness of a judgment to be waived by the conduct or the consent of the parties. . . . [A]n unwarranted delay in the issuance of a judgment does not automatically deprive a court of personal jurisdiction. Even after the expiration of the time period within which a judge has the power to render a valid, binding judgment, a court continues to have jurisdiction over the parties until and unless they object. It is for this reason that a late judgment is merely voidable, and not void." (Citation omitted; internal quotation marks omitted.) *Foote* v. *Commissioner of Correction*, supra, 125 Conn. App. 300–301, quoting *Waterman* v. *United Caribbean, Inc.*, supra, 215 Conn. 692; see also *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 269–70, 25 A.3d 632 (2011) (noting that § 51-183b concerns personal rather than subject matter jurisdiction).

The "completion date" of trial, for purposes of starting the 120 day period, includes the filing of briefs and completion of oral argument because "briefing of the legal issues [is] a component of the judicial gathering of the materials necessary to a well reasoned decision. In related contexts, 'completion' has been held to encompass the availability of all the elements directly or indirectly to be considered in the rendering of a decision." *Frank* v. *Streeter*, 192 Conn. 601, 604, 472 A.2d 1281 (1984); see also *Fibre Optic Plus, Inc.* v. *XL Specialty Ins. Co.*, 125 Conn. App. 399, 406, 8 A.3d 539 (2010) ("completion date" includes any oral argument heard subsequent to filing of briefs), cert. granted, 300

Conn. 907, 12 A.3d 1003 (2011) (appeal withdrawn February 14, 2012), and cert. granted, 300 Conn. 907, 12 A.3d 1003 (2011) (appeal withdrawn February 28, 2012).

Our decision in *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, supra, 302 Conn. 263, controls the plaintiffs' claim in the present appeal. In that case, we followed the Appellate Court's decision in *Statewide Grievance Committee* v. *Ankerman*, 74 Conn. App. 464, 470, 812 A.2d 169, cert. denied, 263 Conn. 911, 821 A.2d 767 (2003), and concluded that, "when a trial court properly reopens a case *during* the pendency of the 120 day statutory time period, the completion of proceedings scheduled on the date the proceedings were reopened constitutes the relevant completion date for purposes of commencing the 120 day limitation period for rendering judgment." (Emphasis added.) *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, supra, 271; see also *Statewide Grievance Committee* v. *Ankerman*, supra, 470 (trial court's order that attorney appear at hearing on disposition of grievance proceedings opened 120 day period). Thus, under *Forvil*, the trial court's order requiring supplemental briefing and argument within 120 days had the effect of stopping the decision period and then restarting it after supplemental arguments were heard.

The plaintiffs' reply brief relies, however, on *Waterman* v. *United Caribbean, Inc.*, supra, 215 Conn. 688, for the proposition that their July 18, 2018 refusal to consent to a late decision deprived the trial court of authority to render a late judgment. See id., 694 (concluding that parties could not withdraw their prejudgment refusal to consent upon subsequently learning of favorable judgment). We understand the plaintiffs to argue that, under *Waterman*, their refusal to extend the deadline acted, as a matter of law, to block the court from subsequently reopening the decision period in any way, even to address a jurisdictional issue. We disagree with this reading of *Waterman*. First, that case is factually distinguishable from the present case because the trial court in *Waterman* took no steps to open the 120 day period *prior* to its expiration and had not asked for consent until *after* the lapse of the 120 day period. See id., 690 ("[b]y a letter dated October 5, 1988, which acknowledged that a judgment had *not* been rendered within the 120 day period . . . the trial court asked the parties to consent to an extension of time until December 15, 1988" [emphasis added]). In contrast to *Waterman*, the trial court in the present case acted to reopen the jurisdictional period by requesting supplemental briefing and argument while it still had personal jurisdiction because the 120 day period had not yet elapsed.

Second, beyond the trial court's inherent discretion to seek supplemental briefing and argument on factual

or legal issues in the case, the plaintiffs' *Waterman* argument, insofar as it concerns the trial court's decision to raise a colorable question of subject matter jurisdiction, squarely conflicts with the axiom that questions about subject matter jurisdiction issues may be raised at *any* time, including by the court, sua sponte, and on appeal. See, e.g., *Angersola* v. *Radiologic Associates of Middletown*, *P.C.*, 330 Conn. 251, 265, 193 A.3d 520 (2018). Indeed, in *Machado* v. *Taylor*, 326 Conn. 396, 404, 163 A.3d 558 (2017), we recently concluded that it "would contravene well settled law" to allow "delay or laches [to preclude] a jurisdictional challenge." In so concluding, we emphasized that "[t]he objection of want of jurisdiction may be made at any time," including by the court sua sponte, and that "[t]he requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings." (Emphasis omitted; internal quotation marks omitted.) Id.; see also id. (concluding that trial court improperly denied motion to dismiss "and render[ed] judgment in favor of the plaintiff without first resolving whether the defendant's motion raised a colorable jurisdictional issue, and, if so, whether it had jurisdiction over the cause of action").

In the present case, we conclude that the trial court's order requiring supplemental briefing stopped the 120 day decision period, which then restarted after supplemental arguments were heard, thus rendering the trial court's decision in this case timely under § 51-183b, notwithstanding the plaintiffs' earlier refusal to consent to the requested extension.[14] Accordingly, § 51-183b did not operate to deprive the trial court of the personal jurisdiction over the parties required to decide this case.

## II

## WHETHER § 9-374 RENDERS THE 2010 BYLAWS CONTROLLING

We next address the second principal issue in this appeal, namely, whether the trial court improperly construed § 9-374 in concluding that the 2010 bylaws, filed after Nader's tally of 1 percent of the vote in the 2008 election afforded the Independent Party statewide status for the first time, were controlling over the 2006 bylaws previously filed by the Danbury faction. The plaintiffs argue that the trial court's construction of § 9-374 has the effect of improperly supplying nonexistent statutory language because, as enacted by the legislature, the statute "contains no requirement" that a party refile its bylaws with the Secretary "upon achieving minor party status." The plaintiffs rely on "[p]ublic policy and common sense," arguing that the trial court's construction of the statute "would create a burdensome and tedious exercise for minor parties that the statutory scheme does not anticipate [or] facilitate," insofar as it would require that "new bylaws . . . be filed every time the Independent Party wins new minor party status

for a given office . . . ." In response, the defendants contend that, under General Statutes § 1-2z, the court's construction of § 9-374 must consider the definition of minor party in a related statute, § 9-372 (6), and that, because the Independent Party did not receive 1 percent of the vote until 2008, "[n]o matter how the plaintiffs styled it, the 2006 filing was not the filing of a statewide minor party." We agree with the defendants and conclude that, under § 9-374, the 2010 bylaws govern the statewide Independent Party.

Whether § 9-374 renders the 2010 bylaws controlling "presents a question of statutory construction over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Marchesi* v. *Board of Selectmen*, 328 Conn. 615, 627–28, 181 A.3d 531 (2018).

Beginning with the statutory text, § 9-374 provides in relevant part: "In the case of a minor party, no authority of the state or any subdivision thereof having jurisdiction over the conduct of any election shall permit the name of a candidate of such party for any office to be printed on the official ballot unless *at least one copy of the party rules* regulating the manner of nominating a candidate for such office has been filed in the office of the Secretary of the State *at least sixty days before* the nomination of such candidate. In the case of a minor party, the selection of town committee members and delegates to conventions shall not be valid unless at least one copy of the party rules regulating the manner of making such selection has been filed in the office of the Secretary of the State at least sixty days before such selection is made. A copy of local party rules shall forthwith be also filed with the town clerk of the municipality to which they relate. Party rules shall not be effective until sixty days *after* the filing of the same

with the Secretary of the State. . . . The term 'party rules' as used in this section includes any amendment to such party rules. When any amendment is to be filed as required by this section, complete party rules incorporating such amendment shall be filed, together with a separate copy of such amendment." (Emphasis added.)

Section 9-374 sets forth two operative time periods with respect to the filing of the party rules. First, the statute requires minor parties to file their party rules with the Secretary "at least sixty days" before nominating a candidate or selecting town committee members and delegates to conventions, and precludes state or municipal officials from putting such candidates on the ballot unless such a filing has been made. Second, § 9-374 provides that such party rules "shall not be effective until sixty days *after* the filing of the same with the Secretary of the State." Given this time frame, we agree that the plaintiffs' reading of § 9-374 is plausible, insofar as there is no statutory language *precluding* a minor party from filing its party rules before a given point in time, or rendering those rules ineffective if filed early, and reading § 9-374—standing by itself—in such a manner might conceivably run afoul of the maxim that, in construing statutes, "[w]e are not permitted to supply statutory language that the legislature may have chosen to omit." (Internal quotation marks omitted.) *State* v. *Josephs*, 328 Conn. 21, 27, 176 A.3d 542 (2018).

We do not, however, read § 9-374 by itself. Section 1-2z counsels us to construe statutes in light of related provisions, as we are "guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *State* v. *Fernando A.*, 294 Conn. 1, 21, 981 A.2d 427 (2009); see also, e.g., *Gilmore* v. *Pawn King, Inc.*, supra, 313 Conn. 555–56 ("in interpreting a statute, [r]elated statutory provisions, or statutes in pari materia, often provide guidance in determining the meaning of a particular word" [internal quotation marks omitted]). Thus, we read § 9-374 in conjunction with § 9-372 (6), which defines " '[m]inor party' " as "a political party or organization which is *not* a major party and whose candidate for the office in question received *at the last-preceding regular election for such office*, under the designation of that political party or organization, at least one per cent of the whole number of votes cast for all candidates for such office at such election . . . ." (Emphasis added.) This definitional statute suggests that a minor party simply does not exist—for purposes of the ballot—unless and until its candidate

receives 1 percent of the vote for a particular office at the last preceding regular election. Put differently, this definition suggests that there is nothing—at least under the contemplation of the statutory scheme—for those bylaws to govern until a putative party's candidate receives 1 percent of the vote for an office.

Another related statute, namely, General Statutes § 9-453u,[15] which governs applications to reserve party designations for candidates on the ballot by petition, further supports this reading. The designation of a candidate under § 9-453u is a precursor to minor party status, and that provision makes clear that a minor party is conceptually distinct under the statutory scheme from an organization seeking a party designation. See General Statutes § 9-453u (c) (3) and (4) (precluding designation of party name that "incorporate[s] the name of any minor party which is entitled to nominate candidates for any office which will appear on the same ballot with any office included in the statement" or is "the same as any party designation for which a reservation with the secretary is currently in effect for any office included in the statement"). These provisions indicate that a minor party simply does not exist for purposes of our election laws until its candidate receives 1 percent of the vote, thus triggering an obligation to file party rules and creating a party line on the ballot for the next election. Because a minor party does not exist prior to that point, ipso facto, party rules filed prior thereto simply have no effect with respect to the obligations of the Secretary.

Although there is no legislative history to illuminate the meaning of the statutes further, we observe that limiting the effective party rules to those filed after the putative minor party's candidate receives 1 percent of the vote, along with the sixty day period before those rules take effect, has the salutary effect of allowing the party to take shape and potentially eliminate the confusion sown by factional disputes, such as that in this case. The statutory framework also reflects the organic nature of the development of statewide parties like the Independent Party that have their genesis in a conglomeration of smaller or local groups, each with their own history and political interests. Accordingly, we conclude that the trial court properly determined that the 2010 bylaws are the effective party rules of the Independent Party, because they were filed after Nader received 1 percent of the vote as a statewide candidate.[16]

## III

## ADDITIONAL CLAIMS

Beyond the principal issues in this appeal, the plaintiffs also raise numerous other claims. Specifically, the plaintiffs contend that the trial court improperly (1) failed to afford preclusive effect to Judge Taylor's decision in the 2012 Waterbury action, (2) determined that

they had waived their rights to challenge the adoption of the 2010 bylaws, (3) adopted a construction of § 9-374 that violated the parties' constitutional rights, and (4) permitted the defendants to amend their answer to add special defenses and counterclaims after the close of evidence. See footnote 6 of this opinion. Because we conclude that all of these claims lack merit, we briefly address each in turn.

A

Preclusive Effect of 2012 Waterbury Action

The plaintiffs contend that the trial court's decision improperly conflicts with Judge Taylor's decision in the 2012 Waterbury action; see *Independent Party of Connecticut* v. *Dietter*, supra, Superior Court, Docket No. CV-12-5016387-S; an action brought and withdrawn by the Waterbury faction after Judge Taylor denied its motion for a temporary order of mandamus based on his finding that the "Independent Party did not follow the amendment procedures provided in the 2006 [bylaws] for the adoption of amendments to those rules in 2010." The plaintiffs argue that Judge Taylor's decision was well reasoned and considered "essentially the same issues between essentially the same parties," and that the trial court in this case should have accorded it preclusive effect given the defendants' "gamesmanship" in withdrawing that action upon receipt of an adverse ruling. In response, the defendants contend that Judge Taylor's decision in the 2012 Waterbury action lacks preclusive effect in the present case because it was specifically intended to be a preliminary decision rendered on an expedited basis and not a final judgment on the merits. We agree with the defendants and conclude that Judge Taylor's decision in the 2012 Waterbury action has no preclusive effect with respect to the present case.

The record reveals the following additional relevant facts and procedural history. In one chapter of this dispute between the parties; see footnote 9 of this opinion; the officers of the Waterbury faction and its nominees for the 16th senate district and the 106th assembly district brought the 2012 Waterbury action against the Secretary, the officers of the Danbury faction, and their corresponding house and senate candidates, seeking a declaration and an order directing the Secretary to place the Waterbury faction's candidates on the ballot for the 2012 election. *Independent Party of Connecticut* v. *Dietter*, supra, Superior Court, Docket No. CV-12-5016387-S. In that case, Judge Taylor observed that the "essential dispute between the parties revolve[d] around the validity and proper adoption of political party rules following the Independent Party of Connecticut's qualification as a minor political party for presidential elections, inter alia, which occurred after the 2008 election." Id. Along with their complaint, the Waterbury faction filed a motion seeking a temporary

order of mandamus. Id. After conducting an evidentiary hearing and receiving memoranda of law on an expedited basis, the court issued a decision denying that motion. Id.

Although Judge Taylor agreed with the Waterbury faction's claim that "the 2006 [bylaws] concerning the party nomination process are extremely general and do not so much as state the vote required for a local committee or caucus endorsement," he nevertheless rejected its argument that the 2006 bylaws did not comply with § 9-374, concluding that "there are no specific requirements listed in the statute to guide a political party in adopting party rules 'regulating the manner of nominating a candidate . . . .' " Id. Judge Taylor then observed that the "question presented is whether the [Waterbury faction] properly convened a caucus of the Independent Party of Connecticut in 2010 to amend the 2006 [bylaws] and [to] elect new officers pursuant to the newly adopted 2010 [bylaws]. The court finds that the [Waterbury faction] did not follow the amendment procedures provided in the 2006 [bylaws] for the adoption of amendments to those rules in 2010. The court further finds that the 2010 amendments made to the 2006 [bylaws] occurred at a caucus of the [Waterbury faction] pursuant to a statute that is inapplicable to the amendment of state party rules. These findings lead to the court's conclusion that the [Waterbury faction] has failed to establish a clear legal right to the performance of a duty by the [Secretary] necessary for the issuance of an order of mandamus in this case."[17] Id.

Judge Taylor emphasized, however, that, "[t]hus far in this case . . . the court has held only an expedited hearing on a preliminary [m]otion for a [t]emporary [order of] [m]andamus. The court notes that *there has not yet been a full opportunity for an exploration into the questions raised at the preliminary hearing as to whether the 2006 [bylaws] are fatally inconsistent with state elections statutes*, other than § 9-374 standing alone. The 2006 [bylaws] appear to be vintage party rules, allowing for strong party leadership through a self-perpetuating central committee, holding a veto over party endorsements that appear inconsistent with more modern and open party rules and procedures. These issues would be more thoroughly considered in a motion to dismiss, which the [Danbury faction] has not yet filed. Accordingly, in light of the inextricable link between the issue of standing and the merits of the [Waterbury faction's] underlying claims, the court will postpone a determination of the jurisdictional issue." (Emphasis added.) Id. After Judge Taylor's ruling on the motion for a temporary order of mandamus, the Waterbury faction subsequently withdrew the 2012 Waterbury action.

Whether the preclusion doctrine of collateral estoppel or res judicata applies is a question of law subject

to plenary review. See, e.g., *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 738–39, 183 A.3d 611 (2018). "Although res judicata and collateral estoppel often appear to merge into one another in practice, analytically they are regarded as distinct." *Weiss* v. *Weiss*, 297 Conn. 446, 458–59, 998 A.2d 766 (2010). "The doctrine of res judicata provides that [a] valid, final judgment rendered on the merits by a court of competent jurisdiction is an absolute bar to a subsequent action between the same parties . . . upon the same claim or demand. . . . Res judicata prevents a litigant from reasserting a claim that has already been decided on the merits. . . . Under claim preclusion analysis, a claim—that is, a cause of action—includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. . . . Moreover, claim preclusion prevents the pursuit of any claims relating to the cause of action which were actually made or might have been made. . . . [T]he essential concept of the modern rule of claim preclusion is that a judgment against [the] plaintiff is preclusive not simply when it is on the merits but when the procedure in the first action afforded [the] plaintiff a fair opportunity to get to the merits. . . . Stated another way, res judicata is based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . [W]here a party has fully and fairly litigated his claims, he may be barred from future actions on matters not raised in the prior proceeding." (Citations omitted; emphasis altered; internal quotation marks omitted.) Id., 459–60.

"[I]t is significant that the doctrine of res judicata provides that [a] judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose. . . . The rule of claim preclusion prevents reassertion of the same claim regardless of what additional or different evidence or legal theories might be advanced in support of it." (Internal quotation marks omitted.) Id., 463.

Similarly, the "fundamental principles underlying the doctrine of collateral estoppel are well established. The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality. . . . Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been *fully and fairly litigated* in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . .

"An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. . . . If an issue has been determined, but the judgment is not dependent [on] the determination of the issue, the parties may relitigate the issue in a subsequent action. . . . Before collateral estoppel applies [however] there must be an identity of issues between the prior and subsequent proceedings. To invoke collateral estoppel the issues sought to be litigated in the new proceeding must be identical to those considered in the prior proceeding. . . . In other words, collateral estoppel has no application in the absence of an identical issue. . . . Further, an overlap in issues does not necessitate a finding of identity of issues for the purposes of collateral estoppel." (Citations omitted; emphasis altered; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 328 Conn. 739–40.

Finality of judgment is critical because "the preclusive effects of res judicata and collateral estoppel depend upon the existence of a valid, final judgment on the merits by a court of competent jurisdiction."[18] *Slattery* v. *Maykut*, 176 Conn. 147, 157, 405 A.2d 76 (1978); see also id. ("a judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata in the absence of fraud or collusion even if obtained by default, and is just as conclusive an adjudication between the parties of whatever is essential to support the judgment as when rendered after answer and complete trial"); *Corey* v. *Avco-Lycoming Division*, 163 Conn. 309, 317–18, 307 A.2d 155 (1972) (decisions of administrative board acting in judicial capacity are entitled to res judicata effect), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973). This need for finality reflects the fact that the application of preclusion doctrines can have "dramatic consequences for the party against whom the doctrine is applied." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 59, 808 A.2d 1107 (2002).

Accordingly, courts have held that preliminary decisions, such as on preliminary injunctions or other temporary orders, are not entitled to preclusive effect, particularly when the court makes clear that it is a "tentative ruling . . . not intended as a final decision on the merits. Ordinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial." *Irish Lesbian & Gay Organization* v. *Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998); see also id., 644–46 (treating District Court's earlier decision as on merits and subject to res judicata effect, rather than about whether to grant preliminary injunction, because

it dismissed plaintiff's claims after hearing and "gave no indication that this ruling was tentative or done without prejudice, and [the plaintiff] did not dispute the dismissal at the time"); *Gawker Media, LLC* v. *Bollea*, 129 So. 3d 1196, 1204 (Fla. App. 2014) ("we are not convinced that a ruling at such a provisional stage in the proceedings should have preclusive effect," and preliminary injunction rulings may be given preclusive effect only if "the prior decision is based on a decisive determination and not on the mere likelihood of success"); *Malahoff* v. *Saito*, 111 Haw. 168, 182 n.16, 140 P.3d 401 (2006) (grant of preliminary injunction is "not a final judgment sufficient for collateral estoppel purposes" unless intended as final resolution [internal quotation marks omitted]). Declining to accord the effect of finality to preliminary decisions, such as on preliminary injunctions or other temporary orders, is consistent with the observation of the United States Supreme Court that such orders are often issued with "haste" and are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas* v. *Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981).

Having reviewed Judge Taylor's decision in the 2012 Waterbury action, it is clear that he rendered it on an expedited basis as, in essence, a preliminary injunction ruling, without benefit of full exploration of the questions raised. Judge Taylor specifically emphasized that his denial of the Waterbury faction's motion for a temporary order of mandamus was tentative and *not* a final judgment on the merits. Accordingly, we conclude that the trial court properly declined to give preclusive effect to Judge Taylor's decision in the 2012 Waterbury action.[19]

### B

### Special Defense of Waiver

The plaintiffs next claim that the trial court "improperly intervened in the party's internal affairs" because the 2010 bylaws are "invalid" given that the defendants did not follow the amendment procedure contained in the 2006 bylaws. In this vein, the plaintiffs also contend that the trial court improperly held for the defendants with respect to the special defense of waiver; the plaintiffs contend specifically that the trial court improperly found that they had waived any right to challenge the validity of the 2010 bylaws, because, since 2012, they have operated in accordance with Judge Taylor's decision in the 2012 Waterbury action, which held that the 2010 bylaws were not a properly executed amendment of the 2006 bylaws. In addition to renewing their statutory argument that the 2006 bylaws were not binding on the statewide Independent Party, which was a new entity that did not exist until after the 2008 election, the defendants also contend that the trial court properly

found that the plaintiffs waived objection to the 2010 bylaws by "their acquiescence in the process of their adoption and in the use of those bylaws, with their express consent, to govern subsequent nominations and endorsements." We agree with the defendants and conclude that the trial court's finding that the plaintiffs had waived any objection to the use of the 2010 bylaws to govern Independent Party proceedings was not clearly erroneous.

"Waiver is a question of fact. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . Therefore, the trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. . . .

"Waiver is the intentional relinquishment or abandonment of a known right or privilege. . . . Waiver is based upon a species of the principle of estoppel and where applicable it will be enforced as the estoppel would be enforced. . . . Estoppel has its roots in equity and stems from the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . .

"Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Citations omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622–23, 866 A.2d 582 (2005); accord *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 318 Conn. 737, 747, 123 A.3d 417 (2015); see also *DeLeo* v. *Equale & Cirone, LLP*, 180 Conn. App. 744, 758–60, 184 A.3d 1264 (2018) (finding that defendant did not waive noncompete clause in partnership agreement was not clearly erroneous, despite defendant's statement encouraging plaintiff to take clients and that he did not want to hurt plaintiff, because defendant never denied existence or enforceability of noncompete clause and reiterated accounting firm's intention to adhere to partnership agreement, which required compensation when departing partner took clients); *Santos* v. *Zoning Board of Appeals*, 144 Conn. App. 62, 66–67, 71 A.3d 1263 (concluding that trial court's finding that plaintiff had waived 120 day decision deadline under § 51-183b "by executing multiple agreements to extend the period for the court to render judgment" was clearly erroneous because plaintiff "seasonably objected" to late decision and agreements "set forth a specific date beyond which their consent to a late judgment would not extend"),

cert. denied, 310 Conn. 914, 76 A.3d 630 (2013); *Grey* v. *Connecticut Indemnity Services, Inc.*, 112 Conn. App. 811, 815–16, 964 A.2d 591 (2009) (trial court's finding that defendant waived right to arbitration was not clearly erroneous because she "acted inconsistently with her contractual right to arbitration" by litigating case in court for three years before moving to compel arbitration on eve of trial).

We conclude that the trial court's factual finding of waiver with respect to the 2010 bylaws was not clearly erroneous and was, moreover, consistent with the court's legal conclusion under § 9-374 and its underlying findings—namely, that the Independent Party, as constituted in contemplation of the 2008 election, was a newly formed political party that had roots in various local independent parties around the state, including those from Danbury and Waterbury. Thus, the record amply supports the trial court's findings of "numerous indicators that the plaintiffs have waived their right to contest the validity of the 2010 bylaws." For example, the trial court properly credited testimony by Telesca and Mertens in finding that that Telesca and Fand "actively worked together starting in 2008 to create a statewide Independent Party in 2008 by petitioning to get Nader ballot access for the office of [the] president of the United States. Both Fand and Telesca filed a joint ED-601 party designation form on behalf of the Independent Party on May 5, 2008."[20] (Footnote omitted.) After Nader received the requisite 1 percent of the vote, "Telesca and Mertens then began drafting bylaws for the new statewide party in an effort to comply with § 9-374. They sent the bylaws they drafted to local Independent Party town committee chairs,[21] and arranged for a statewide party meeting/caucus to vote on the proposed bylaws." (Footnote added.) As the trial court found, Telesca and Iorio "met personally with Fand to discuss the proposed bylaws; Fand did not object to the planned meeting, nor did he object to the idea of creating new bylaws for the statewide party or to the bylaws themselves. After the bylaws were unanimously adopted at the March 20, 2010 party meeting and later filed with the [Secretary], neither Fand nor any other member of the Danbury faction objected to them,"[22] either at the meeting or after they were filed with the Secretary.

"Moreover, when the Independent Party held a caucus on August 21, 2010, to endorse candidates for various offices pursuant to the 2010 bylaws, Fand and other members of the Danbury faction attended the meeting and did not question or object to their use. In addition, both Fand and LaFrance, two-thirds of the [Danbury faction], signed the endorsement form filed with the Waterbury town clerk and the [Secretary] along with Telesca, which specified the candidates that the Independent Party had endorsed for the 2010 elections at the August 21 meeting." The 2010 bylaws also governed the 2011 municipal election cycle, with no objection by

Fand or the Danbury faction. "Fand and others in the Danbury faction also used the 2010 bylaws to govern [statewide] nominations/endorsements for the 2010, 2012 and 2014 election cycles without any objection," including the presidential election in 2012.

As the trial court found, Fand and the Danbury faction "did not call the legitimacy of the 2010 bylaws into question until sometime in 2012 when [Fand and Telesca] first disagreed about the nomination of Mark Boughton, the Republican mayor of Danbury, who was hoping for the endorsement of the Independent Party in connection with his gubernatorial ambitions in 2012." Accordingly, the trial court found that "there is nothing in the law that prevented Telesca from filing the 2010 bylaws with the [Secretary], and that the plaintiffs' knowledge about the drafting and adoption of such bylaws and their failure to object demonstrate their de facto acceptance of them." We conclude that the trial court did not commit clear error in finding, with respect to the special defense of waiver, that "the defendants have established by a preponderance of the evidence submitted in this case that the plaintiffs have waived any right they may have had to challenge the validity of the 2010 bylaws."

C

Constitutional Claims

The plaintiffs next argue that the trial court's decision violated the parties' rights under the first amendment to the United States constitution and article first, § 14, of the Connecticut constitution by directing the Secretary to accept only those Independent Party nominations "made pursuant to the 2010 bylaws . . . ." They contend that this order is an improper interference with the Independent Party's right to choose its candidates in accordance with its own desires and hurts the party by depriving the Danbury faction of the right to make an endorsement even when the Waterbury faction has not made a competing endorsement, thus adversely affecting the entire party's chance to maintain the ballot line for future elections. In response, the defendants contend, inter alia, that this claim is unreviewable because the plaintiffs did not raise it before the trial court. The defendants also argue that the trial court's "disposition of the parties' dispute [with an order to the Secretary] was a necessary and appropriate judicial action" to which the plaintiffs had agreed at trial, because they named her as a defendant and explained to the trial court the necessity of an order directed to the Secretary given her office's long established policy of not accepting a minor party's nomination for an office when there is a conflicting nomination under the same party designation. We agree with the defendants and conclude that the plaintiffs waived their constitutional claim by inducing any claimed error.

The plaintiffs' failure to raise their constitutional claim before the trial court ordinarily would not be fatal to appellate review, insofar as we could consider it under the bypass doctrine of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[23] See, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 402 n.10, 125 A.3d 920 (2015) (*Golding* doctrine applies in civil cases); see also *State* v. *Elson*, 311 Conn. 726, 750–51, 91 A.3d 862 (2014) (*Golding* review is available when record is adequate and claim fully briefed, even without specific invocation of doctrine or acknowledgment of unpreserved nature of claim).

It is well settled, however, that *Golding* review is not available when the claimed constitutional error has been induced by the party claiming it. See, e.g., *State* v. *Coward*, 292 Conn. 296, 305, 972 A.2d 691 (2009); *State* v. *Cruz*, 269 Conn. 97, 106–107, 848 A.2d 445 (2004). "[A] party cannot take a path at trial and change tactics on appeal." (Internal quotation marks omitted.) *State* v. *Martone*, 160 Conn. App. 315, 327, 125 A.3d 590, cert. denied, 320 Conn. 904, 127 A.3d 187 (2015). "[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the [allegedly] erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error and induced constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party. . . . [W]hether we call it induced error, encouraged error, waiver, or abandonment, the result— that the . . . claim is unreviewable—is the same." (Citations omitted; internal quotation marks omitted.) Id., 328.

Our review of the record leads us to conclude that the plaintiffs induced the claimed constitutional error in this case by naming the Secretary as a defendant and seeking an order directed to her. In their posttrial memorandum of law, the plaintiffs explained that the Secretary "remains as the first named [d]efendant for two reasons. First, the [Secretary] practices a long-standing policy of not accepting a candidate's nomination to office by a minor party when the [Secretary's] office receives a conflicting nomination with the same minor party designation for a given office. Therefore, the [trial court's] granting [of the plaintiffs'] third prayer for relief will compel the [Secretary] to recognize nominations from the plaintiffs as the valid nominations from the Independent Party, invalidating conflicting ones by [the defendants] or otherwise. Second, without the third prayer for relief, the [Secretary]—by enforcing its long-standing policy—stands positioned to cause the plaintiffs irreparable harm. This harm has been caused in at

least the last three . . . state election cycles." (Footnote omitted.) The relief granted to the defendants, namely, a declaration that they, rather than the plaintiffs, are the "rightful" officers of the Independent Party, with the 2010 bylaws controlling, and an order that the Secretary "recognize the above and to treat nominations and endorsements made pursuant to [the] 2010 bylaws as nominations and endorsements of the Independent Party of Connecticut," is simply a mirror image of that requested by the plaintiffs. Accordingly, because we consider the alleged constitutional errors to have be induced by the plaintiffs' own litigation tactics, we decline to review those claims.

### D

### Amendment of Pleadings

The plaintiffs' final claim is that the trial court abused its discretion by granting the defendants' request to amend their answer to add special defenses and counterclaims after the close of evidence. In response, the defendants contend that the plaintiffs were not prejudiced by the amendment, insofar as they have not identified anything that they would have done differently had the amendment either not been permitted or made earlier, and observe that the plaintiffs did not seek a continuance to address any new factual issues. The defendants rely on *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, 266 Conn. 572, 833 A.2d 908 (2003), and emphasize that the amended pleading did not change any of the factual issues in the case, and that any changes were purely questions of law that the plaintiffs could address in posttrial briefing. We agree with the defendants and conclude that the trial court did not abuse its discretion by allowing them to amend their answer.

The record reveals the following additional relevant facts and procedural history. On October 10, 2017, on the eve of trial, the defendants sought permission to file an amended answer, including four special defenses and a counterclaim. The original answer did not include any special defenses or counterclaims. The proposed amended answer asserted the following special defenses: (1) the plaintiffs "lack standing to file and prosecute this action"; (2) the plaintiffs "have ratified the actions of the defendants in filing bylaws for the Independent Party of Connecticut in 2010 or have waived any right they might have had to challenge it"; (3) the "purported bylaws [of 1987 and 2006] violate rights of free of association [under] the first amendment [and] the Connecticut Constitution"; and (4) the 2006 bylaws were adopted without authority and therefore invalid. The defendants also filed a counterclaim seeking a declaratory judgment "that they are [the] rightful officers of the Independent Party of Connecticut [and] that the individual plaintiffs . . . are not . . . ." The plaintiffs objected to the request, and the trial court

considered argument on the proposed amendment on October 11, 2017, which was the first day of trial.[24] The trial court held the defendants' motion in abeyance and, after the close of evidence, indicated that it would overrule the plaintiffs' objection and permit the amendment.

"While our courts have been liberal in permitting amendments . . . this liberality has limitations. Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of the delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. . . . The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial. . . . Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion. . . . It is the [appellant's] burden to demonstrate that the trial court clearly abused its discretion. . . . If an amendment is allowed at trial and the opponent wants to raise an abuse of discretion issue on appeal, he should immediately move for a continuance in the trial in order to defend against the new issue. . . . Under certain circumstances, the trial court may allow an amendment to plead an additional special defense even after judgment has entered." (Citations omitted; internal quotation marks omitted.) *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, supra, 266 Conn. 583–84.

In considering whether a trial court has abused its discretion "in granting or denying a request to amend a [pleading] during or after trial," we recognize that "the trial court has its unique vantage point in part because it is interpreting the . . . allegations not in a vacuum, but in the context of the development of the proceedings and the parties' understanding of the meaning of those allegations. Similarly, prior to trial, in light of discovery, pretrial motions or conferences, a trial court may have a different context for the allegations than what is evident to an appellate court." *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 799 n.4, 945 A.2d 955 (2008).

We conclude that the trial court did not abuse its discretion in allowing the late amendment to the defendants' answer because it did not prejudice the plaintiffs. In their reply brief, the plaintiffs posit only that they were injured by the late amendment because the trial court "ultimately found in favor of the defendants on one special defense [of waiver] and on their counterclaim. The injury is that the trial court could not have found waiver or found in favor of the defendants on their counterclaim if the court had not permitted the amendment." Beyond the obviously adverse result of

losing, however, the plaintiffs do not indicate that the trial court's decision to permit the amendment adversely affected the process. Specifically, they do not argue that they would have litigated the case differently had the trial court not permitted the amendment, or that they were deprived of any additional time necessary to respond to the amendment. Indeed, the trial court specifically afforded the plaintiffs fourteen days to file any necessary responsive pleading, in addition to posttrial briefing. See *Dow & Condon, Inc.* v. *Brookfield Development Corp.*, supra, 266 Conn. 584 (The court noted that no prejudice resulted from allowing the inclusion of a special defense claiming a violation of state regulations because the plaintiff did not seek a continuance, and "the new affirmative defense did not inject any new factual issues into the case, but instead raised a purely legal issue. The plaintiff had the opportunity to address that issue fully in its posttrial brief to the court, which was filed nearly one month after trial. Finally . . . the trial court would have been obligated to consider the effect of the regulation on the enforceability of the cobrokerage agreement even if it had not been raised as a special defense."); *Burton* v. *Stamford*, 115 Conn. App. 47, 61–62, 971 A.2d 739 (declining to find that trial court abused its discretion by permitting late amendment of complaint when key factual issues remained same despite new theory of liability that would have required changes to jury instructions), cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009).

Nor do the plaintiffs indicate that the late "amendment . . . confuse[d] the issues in the case . . . ." *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 759, 95 A.3d 1031 (2014); cf. *LaFrance* v. *Lodmell*, 322 Conn. 828, 847–48, 144 A.3d 373 (2016) (it was not abuse of discretion to deny defendant permission to amend cross complaint and related defenses at "late stage" when amendment "would have raised many complex issues, which would have required motions and discovery" that "would have significantly delayed the trial and prejudiced the plaintiff"). This suggests, then, that the late amendment to the answer did not prejudice the plaintiffs. Accordingly, we conclude that the trial court did not abuse its discretion by permitting the late amendment to the defendants' answer.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] Duff is the chairman of the Independent Party of CT—State Central, LaFrance is its treasurer, and Palanzo is its secretary and deputy treasurer. Although the previous chairman, John L. Dietter, was originally a plaintiff in the present action, he died in November, 2016. LaFrance and Palanzo later appointed Duff to the position of chairman, and, shortly thereafter, the trial court granted a motion substituting Duff as a plaintiff. We note that, notwithstanding this substitution, the plaintiffs' appeal form in the present case continues to identify Dietter as chairman. The record reflects that this is nothing more than a scrivener's error. Cf. *State* v. *Zillo*, 124 Conn. App. 690, 691 n.1, 5 A.3d 996 (2010).

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General

Statutes § 51-199 (c) and Practice Book § 65-1. See also footnote 1 of this opinion. We then ordered, sua sponte, that this appeal "be considered on an expedited basis," and set a briefing and argument schedule accordingly.

[3] For the sake of simplicity, we hereinafter refer to Merrill as the Secretary and to Telesca and Frank, collectively, as the defendants.

[4] General Statutes § 51-183b provides: "Any judge of the Superior Court and any judge trial referee who has the power to render judgment, who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days from the completion date of the trial of such civil cause. The parties may waive the provisions of this section."

[5] General Statutes § 9-374 provides in relevant part: "In the case of a minor party, no authority of the state or any subdivision thereof having jurisdiction over the conduct of any election shall permit the name of a candidate of such party for any office to be printed on the official ballot unless at least one copy of the party rules regulating the manner of nominating a candidate for such office has been filed in the office of the Secretary of the State at least sixty days before the nomination of such candidate. In the case of a minor party, the selection of town committee members and delegates to conventions shall not be valid unless at least one copy of the party rules regulating the manner of making such selection has been filed in the office of the Secretary of the State at least sixty days before such selection is made. A copy of local party rules shall forthwith be also filed with the town clerk of the municipality to which they relate. Party rules shall not be effective until sixty days after the filing of the same with the Secretary of the State. . . . The term 'party rules' as used in this section includes any amendment to such party rules. When any amendment is to be filed as required by this section, complete party rules incorporating such amendment shall be filed, together with a separate copy of such amendment."

[6] In addition to the principal issues, the plaintiffs also claim that the trial court improperly (1) determined that it was not bound by an earlier decision of the Superior Court in *Independent Party of Connecticut* v. *Dietter*, Superior Court, judicial district of Waterbury, Docket No. CV-12-5016387-S (September 28, 2012), (2) found that they had waived their right to challenge the 2010 bylaws, (3) issued an order that violated the parties' constitutional rights, and (4) allowed the defendants to amend their answer to assert a counterclaim and special defenses. We conclude that these additional claims lack merit. See part III of this opinion.

[7] As the trial court noted, a form ED-601 "is required to be filed with the [Secretary] to reserve a party designation in any race where a candidate must petition to get on the ballot. See General Statutes §§ 9-353b and 9-453u. A reservation of party designation may only be filed for a race in which another similarly named party has not already filed such a form."

[8] General Statutes § 9-372 (6) provides: " 'Minor party' means a political party or organization which is not a major party and whose candidate for the office in question received at the last-preceding regular election for such office, under the designation of that political party or organization, at least one per cent of the whole number of votes cast for all candidates for such office at such election . . . ."

[9] See *Price* v. *Independent Party of CT—State Central*, 323 Conn. 529, 543, 147 A.3d 1032 (2016) (single justice proceeding before *Palmer, J.*, dismissing Waterbury faction's motion for permeant injunction, in connection with Independent Party nomination for United States Senate, for lack of jurisdiction because "officials administering minor party caucuses are not 'election official[s]' for purposes of [General Statutes] § 9-323"); *Independent Party of CT—State Central* v. *Telesca*, Superior Court, judicial district of Danbury, Docket No. CV-14-6015650-S (August 4, 2014) (stipulation between parties regarding conflicting candidate endorsements for 2014 election); *Independent Party of Connecticut* v. *Dietter*, Superior Court, judicial district of Waterbury, Docket No. CV-12-5016387-S (September 28, 2012) (withdrawn by Waterbury faction after denial of motion for temporary order of mandamus).

[10] We note that none of the parties challenges the court's subject matter jurisdiction over this case under the political question doctrine, and, having considered the issue sua sponte; see, e.g., *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 91, 971 A.2d 1 (2009); we agree with the trial court's conclusion that, although this case is an intraparty dispute, its resolution "required [the court] to interpret § 9-374 and related provisions to determine which bylaws govern the Independent Party's nomination procedures for candidates for public office, which is the central dispute between the parties. . . . [S]uch issues of statutory interpretation are regularly entertained by the [court] and are well within its jurisdiction." See *Nielsen* v. *Kezer*, 232

Conn. 65, 76, 652 A.2d 1013 (1995) (The court concluded that the political question doctrine did not preclude judicial resolution of an intraparty dispute because "the plaintiffs' claims present no special obstacles to judicial ascertainment and application of appropriate standards for resolving them, and adjudication of the claims does not require judicial policy-making properly left to another branch of government. On the contrary, the controversy raises issues of constitutional and statutory interpretation of the kind regularly entertained by courts."); see also id., 77 n.19 ("We recognize, of course, that the issues raised by the plaintiffs' action relate to activities that are at the heart of our political process. Nonetheless, the mere fact that the suit seeks protection of a political right does not mean it presents a political question. . . . The doctrine of which we treat is one of political questions, not one of political cases." [Citation omitted; internal quotation marks omitted.]).

[11] The court also observed that "there is no evidence that any other local party adhered to the 2006 bylaws or that the [Danbury faction] actually sought to impose the will of its three member state central committee beyond [Danbury]. Although the [Danbury faction] may have won the race to the [Secretary's] office and referred to themselves by a name which included the designation 'State Central,' that is not enough to anoint them as the governing body of the Independent Party post-2008." The court observed that the "designation 'State Central' has no real significance in the organization or operation of a minor party. It is simply a name chosen by the [Danbury faction] and carries with it no special status. For reasons previously stated in the findings of fact, there is no indication that [the Danbury faction] has statewide reach although they continue to claim that they are the true governing entity of the statewide Independent Party."

[12] The trial court also rejected the plaintiffs' argument that the 2010 bylaws afford the Independent Party statewide status only for particular offices, emphasizing that "nothing in § 9-374 or any other statute concerning minor parties states that bylaws must be repeatedly filed every time a minor party candidate achieves 1 percent of the vote for any office, unless those bylaws are amended."

[13] We note that significant motions practice continued before the trial court subsequent to the commencement of appellate proceedings, as numerous candidates for the state House of Representatives sought to intervene in the present case and otherwise protect their rights with respect to the judgment of the trial court as it affected the Independent Party's endorsements for the 2018 election, ultimately leading them to file a writ of error under Docket Number SC 20160. A detailed discussion of those additional facts and procedural history is set forth in a separate opinion of this court pertaining to that writ of error, which is also released today. See *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 729,    A.3d    (2019).

[14] We recognize that the legislature "clear[ly]" intended § 51-183b "to place the onus on judges to decide cases in a timely fashion. . . . [A]s a practical matter, there is nothing that counsel can do to require the trial judge to comply with [§ 51-183b]. . . . Thus, the statute . . . attempts to balance judicial expediency with fairness to the parties and to reduce delays over which counsel have little, if any, control. . . . The salutary effect of [§ 51-183b] is to compel diligence and a prompt decision on the part of the judge who tried the case, and to avoid manifest disadvantages attendant on long delay in rendering judgment." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Foote* v. *Commissioner of Correction*, supra, 125 Conn. App. 304–305; see also *Connecticut Light & Power Co.* v. *Costle*, 179 Conn. 415, 420, 426 A.2d 1324 (1980); *Gordon* v. *Feldman*, 164 Conn. 554, 556–57, 325 A.2d 247 (1973).

We also acknowledge that compliance with the 120 day mandate of § 51-183b while rendering a comprehensive decision is sometimes difficult, especially in relatively complex cases, given the scheduling demands placed on our trial judges, who are often left to their own devices without the aid of legal research assistance. Given the lack of a clearly articulated claim in the present appeal that the trial court abused its discretion by ordering supplemental briefing and argument on the jurisdictional question subsequent to the plaintiffs' refusal to extend the deadline, we leave to another day the question of whether a trial court could ever abuse its discretion by requesting supplemental briefs or argument on any relevant question shortly before the expiration of the 120 day period.

[15] General Statutes § 9-453u provides: "(a) An application to reserve a party designation with the Secretary of the State and to form a party designation committee may be made at any time after November 3, 1981, by filing in the office of the secretary a written statement signed by at least twenty-five electors who desire to be members of such committee.

"(b) The statement shall include the offices for which candidates may

petition for nomination under the party designation to be reserved but shall not include an office if no elector who has signed the application is entitled to vote at an election for such office.

"(c) The statement shall include the party designation to be reserved which (1) shall consist of not more than three words and not more than twenty-five letters; (2) shall not incorporate the name of any major party; (3) shall not incorporate the name of any minor party which is entitled to nominate candidates for any office which will appear on the same ballot with any office included in the statement; (4) shall not be the same as any party designation for which a reservation with the secretary is currently in effect for any office included in the statement; and (5) shall not be the word 'none', or incorporate the words 'unaffiliated' or 'unenrolled' or any similarly antonymous form of the words 'affiliated' or 'enrolled'.

"(d) The statement shall include the names of two persons who are authorized by the party designation committee to execute and file with the secretary statements of endorsement required by section 9-453o and certificates of nomination as required by section 9-460.

"(e) The secretary shall examine the statement, and if it complies with the requirements of this section, the secretary shall reserve the party designation for the offices included in the statement and record such reservation in the office of the secretary. The reservation shall continue in effect from the date it is recorded until the day following any regular election at which no candidate appears on the appropriate ballot for that office under that party designation."

[16] The plaintiffs argue that this reading of the statutory scheme is unworkable because it means that a minor party must refile its rules with the Secretary each time that party's candidate receives 1 percent of the vote for a particular office, thereby affording it party status for that office for the next election. The defendants appear to disagree, insofar as they argue that the 1 percent of the vote received by Nader in 2008 rendered the Independent Party a statewide party, meaning that the 2010 bylaws filed with the Secretary are effective for other statewide offices, such as governor and United States senator. Although the trial court determined that such refiling was not necessary, we agree with the plaintiffs that their reading requiring refiling better accords with the plain language of the statute, insofar as it links minor party status to specific "office[s]." General Statutes § 9-374. We disagree, however, with the plaintiffs' conclusory claim in their reply brief that this reading would create "bedlam" in the Secretary's office. We have every confidence that the Secretary will be able to implement this reading on an administrative level, such as by the promulgation of new forms indicating the continued acceptance and utilization of previously filed party rules, each time a political party receives minor party status for a particular office.

[17] Judge Taylor further stated that, in "reviewing the language of . . . § 9-374 regarding the nomination of candidates by minor parties, the court sees no inconsistency between the plain meaning of the statute and the 2006 [bylaws], currently followed by the [Danbury faction]. Further, the [Waterbury faction] neither followed the amendment procedure of the 2006 [bylaws] nor an applicable statute in the adoption of the 2010 [bylaws]. Therefore, the [Waterbury faction] has not shown that it has a clear legal right to the placement by the [Secretary] of its nominees on the ballot line reserved for the Independent Party of Connecticut, in the face of different nominees from the [Danbury faction]." *Independent Party of Connecticut* v. *Dietter*, supra, Superior Court, Docket No. CV-12-5016387-S.

[18] This emphasis on finality is consistent with the public policies underlying the preclusion doctrines, which are "the interests of the defendant and of the courts in bringing litigation to a close . . . and the competing interest of the plaintiff in the vindication of a just claim. . . . These [underlying] purposes are generally identified as being (1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation. . . . The judicial doctrines of res judicata and collateral estoppel are based on the public policy that a party should not be able to relitigate a matter which it already has had an opportunity to litigate. . . . Stability in judgments grants to parties and others the certainty in the management of their affairs which results when a controversy is finally laid to rest." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 59, 808 A.2d 1107 (2002).

[19] Given the lengthy history of the litigation between the parties, the plaintiffs also rely by analogy upon the law of the case doctrine, and contend that these proceedings should be treated, in essence, as a unitary litigation such that Judge Taylor's decision was the law of the case with respect to the force and validity of the 2010 and 2006 bylaws. "The law of the case

doctrine expresses the practice of judges generally to refuse to reopen what [already] has been decided . . . . New pleadings intended to raise again a question of law which has been already presented on the record and determined adversely to the pleader are not to be favored. . . . [When] a matter has previously been ruled [on] interlocutorily, the court in a subsequent proceeding in the case may treat that decision as the law of the case, if it is of the opinion that the issue was correctly decided, in the absence of some new or overriding circumstance. . . . A judge should hesitate to change his own rulings in a case and should be even more reluctant to overrule those of another judge. . . . Nevertheless, if . . . [a judge] becomes convinced that the view of the law previously applied by his coordinate predecessor was clearly erroneous and would work a manifest injustice if followed, he may apply his own judgment." (Citations omitted; internal quotation marks omitted.) *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 322, 63 A.3d 896 (2013). Here again, the preliminary nature of the proceedings before Judge Taylor in 2012 defeats the plaintiffs' reliance on the law of the case doctrine. We agree with the United States Supreme Court that preliminary injunctions, which are akin to the temporary order of mandamus at issue here, are often issued with "haste" and are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a [preliminary injunction] hearing . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits . . . ." (Citations omitted.) *University of Texas* v. *Camenisch*, supra, 451 U.S. 395. Accordingly, we decline to treat the preliminary decision by Judge Taylor—which was expressly preliminary and expedited—as the law of this case.

[20] Telesca testified that cooperation between him and Fand actually began in 2006, when they jointly signed a form ED-601 seeking a party designation for every single statewide race but did not receive enough votes to afford them minor party status for those offices in subsequent years.

[21] Telesca testified that his goal was "to unify the party, not just Danbury, but Waterbury, Watertown, Winsted, Milford, all the other regional parties that were around. And [he] tried to get everybody to come together to create a statewide party." Similarly, Mertens testified that they modeled their collaborative approach after that taken by the Green Party to combine local organizations into a statewide party under a single set of bylaws.

[22] Telesca testified that, with respect to the 2008 election, he believed that "[d]ifferent rules" governed "different areas of the state," and emphasized his belief that the 2006 bylaws "didn't apply to us" because they "were not my bylaws," and that he did not look to them as a "guide" for drafting the 2010 bylaws. Telesca also testified that he had voiced his objection to the 2006 bylaws, particularly the portion allowing nonmembers to vote in party proceedings, to Fand, Dietter, and LaFrance, and that he told "Fand in 2008 that we would never live under those bylaws. And if we got a party together, we had to create a new set of bylaws, and he agreed." On redirect examination, Telesca emphasized his belief that "there [weren't] any rules in 2010 until we created them" and that they were not in any way bound by the 2006 bylaws, even though they had previously been filed with the Secretary.

[23] We review unpreserved constitutional claims pursuant to *Golding*, under which "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 590 n.8, 175 A.3d 514 (2018); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third prong).

[24] Counsel for the defendants explained to the trial court that he filed the amended answer and counterclaim late because he was not "involved in the case at the time when the complaint was filed," and became involved in the case shortly before trial because the defendants' previous attorney had been suspended from the practice of law. He argued that the proposed amended answer and counterclaim would not affect the development of the record at trial and emphasized that he did not intend for the "allegations of the complaint and the allegations of the answer to be materially different" or change the issues in the case, and that the new pleading was intended "to clean things up . . . ."